James **MOFFETT** and Rozan O'Brien, Petitioners

v.

**LIFE CARE CENTERS OF AMERICA, a Tennessee corporation d/b/a Briarwood Health Care Center, Respondent.**

No. 08SC510.

Supreme Court of Colorado, En Banc.

Nov. 16, 2009.

Law Office of John Robert Holland, P.C., John Robert Holland, Anna C. Holland–Edwards, Erica Tick Grossman, Denver, CO, Attorneys for Petitioners.

Kennedy Childs & Fogg, P.C., Ronald H. Nemirow, Barbara H. Glogiewicz, Miles Buckingham, Denver, CO, Attorneys for Respondents.

Leventhal, Brown & Puga, P.C., Benjamin Sachs, Denver, CO, Attorneys for Amici Curiae AARP and NCCNHR: The National Consumer Voice for Quality Long–Term Care.

Kutak Rock LLP, Mark L. Sabey, Denver, CO, Attorneys for Amicus Curiae Colorado Hospital Association.

Miles & Peters, PC, Fred Miles, Nancy P. Tisdall, Denver, CO, Attorneys for Amici Curiae American Health Care Association, National Center for Assisted Living, Colorado Health Care Association and The Alliance for Quality Nursing Home Care.

The Viorst Law Offices, P.C., Anthony Viorst, Denver, CO, Attorneys for Amicus Curiae Colorado Trial Lawyers Association.

Hall & Evans, L.L.C., Alan Epstein, Beth A. Dickens, Denver, CO, Attorneys for Amicus Curiae Colorado Defense Lawyers Association.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari in *Moffett v. Life Care Centers of America,* 187 P.3d 1140 (Colo.App.2008), to determine whether a person possessing a power of attorney ("POA") may lawfully sign an arbitration agreement on behalf of an incapacitated patient under the arbitration provision of the Health Care Availability Act ("the HCAA"), section 13–64–403, C.R.S. (2009).[1] A person holding a POA is also called an "attorney-in-fact." We use these terms interchangeably throughout this opinion.

The petitioners, James Moffett and his sister, Rozan O'Brien ("the Moffetts"), filed a wrongful death action for the death of their mother, Dorothy Moffett, against Briarwood Life Care Centers ("Briarwood"), a nursing home facility. Briarwood filed a motion to compel arbitration pursuant to an arbitration agreement ("the Agreement") signed by James Moffett, who possessed a POA and a medical durable power of attorney for his mother. The district court denied the motion to compel arbitration, and Briarwood appealed. The court of appeals reversed the trial court. The Moffetts appeal that decision. We affirm the judgment.

In this case, the incapacitated patient executed a POA empowering her son, James Moffett, to act as her attorney-in-fact. The son signed the Agreement in connection with his mother's admission to the nursing home. Nevertheless, the Moffetts contend that the HCAA prohibited the son from entering into the Agreement because only the patient can sign an arbitration agreement and must do so before becoming incapacitated. In the

---

1. The certiorari issues read as follows:
 (1) Whether the court of appeals erred when it held that mere powers of attorney have the authority to execute nursing home arbitration agreements on behalf of incapacitated patients, contrary to the HCAA's arbitration provisions, and the controlling precedents of this court;
 (2) Whether the court of appeals erred when it wholesale adopted the case law from Tennessee, concluding that the legal decision to arbitrate is a "medical treatment decision" in Colorado, and that a medical power of attorney thus has the power to execute non-mandatory nursing home arbitration agreements;
 (3) Whether the court of appeals impermissibly engaged in substituted fact finding for the fact finding properly and clearly made by the trial court, contrary to this court's holding in *J.A. Walker Co., Inc. v. Cambria Corp.,* 159 P.3d 126, 130 (Colo.2007), in that allegations challenging the validity of an arbitration clause itself are to be resolved by the trial court, and which so far departed from the accepted and usual course of judicial proceedings as to call for the exercise of the supreme court's power of supervision.

alternative, they contend that the Agreement is not valid because the nursing home unlawfully conditioned Dorothy Moffett's admission on her son signing the Agreement.

We hold that the HCAA does not prohibit a person possessing a POA from entering into an arbitration agreement on behalf of a person who became incapacitated after executing the POA. We also hold that the trial court must resolve contested factual issues bearing on the validity of the Agreement. In light of our holdings, we need not and do not reach the issue of whether a person holding a medical durable power of attorney is authorized to sign an arbitration agreement on behalf of an incapacitated patient.

### I.

Suffering from Alzheimer's disease, Dorothy Moffett was admitted to Briarwood on February 15, 2004. Two days later, her son, James Moffett, signed forms to admit her, including the Agreement.[2] Moffett admits that he possessed a POA and a medical durable power of attorney for his mother at the time he signed the forms on her behalf. The Agreement, entitled "Voluntary Agreement for Arbitration," provides for arbitration of

> any claim, including, but not limited to, any claim that medical services ... were improperly, negligently, or incompetently rendered or omitted ... [and] all disputes ... arising out of or in any way related or connected to the Resident's stay and care provided at the Facility....

The Agreement contains a comprehensive explanation of arbitration as a method of dispute resolution, and makes explicit that "[t]he execution of [the Agreement] is voluntary and is not a precondition to receiving medical treatment at or for admission to [Briarwood]." The Agreement is binding on all disputes arising out of the patient's stay and care provided by Briarwood, including disputes brought by successors and assigns of the parties. The Agreement was not embedded within the admission agreement and was presented to James Moffett separately from the rest of the paperwork. The last

section of the Agreement states in bold-faced, capitalized text:

> YOU HAVE THE RIGHT TO SEEK LEGAL COUNSEL AND YOU HAVE THE RIGHT TO RESCIND THIS AGREEMENT WITHIN NINETY DAYS FROM THE DATE OF SIGNATURE BY BOTH PARTIES....

> NO HEALTH CARE PROVIDER SHALL WITHHOLD THE PROVISION OF EMERGENCY MEDICAL SERVICES TO ANY PERSON BECAUSE OF THAT PERSON'S FAILURE OR REFUSAL TO SIGN AN AGREEMENT CONTAINING A PROVISION FOR BINDING ARBITRATION OF ANY DISPUTE ARISING AS TO PROFESSIONAL NEGLIGENCE OF THE PROVIDER.

> NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT OR EXERCISED THE NINETY–DAY RIGHT OF RESCISSION.

Despite this right to rescind the Agreement on behalf of his mother within ninety days of signing it, James Moffett did not rescind or attempt to rescind it at any time prior to the filing of this lawsuit.

Dorothy Moffett was admitted to a hospital on October 13, 2004; she died two days later. The Moffetts filed a complaint for wrongful death against Briarwood in Denver District Court. Briarwood moved to stay those proceedings and compel arbitration based upon the Agreement James Moffett signed. The trial court denied Briarwood's motion, holding that Briarwood violated the HCAA by (1) tendering the Agreement to James Moffett when Briarwood knew that Dorothy Moffett lacked rational capacity to sign the Agreement; (2) telling James Moffett that Briarwood would not provide care to Dorothy Moffett unless James Moffett signed the

---

**2.** While James Moffett's signature on the Agreement is not dated, he admitted in a trial court affidavit that he signed it on February 17, 2004.

Briarwood's representative also signed the Agreement on that date.

Agreement; and (3) not directly giving Dorothy Moffett a copy of the Agreement.[3]

The court of appeals reversed the trial court, holding that (1) a person holding a POA for an incapacitated patient may lawfully sign an arbitration agreement on behalf of the principal and (2) a person holding a medical durable power of attorney for an incapacitated patient may lawfully sign an arbitration agreement on behalf of the principal, because the decision to arbitrate in that context is a "medical treatment decision." The court of appeals ordered the trial court to determine whether the POA or medical durable power of attorney contained any restrictions that would have prevented James Moffett from validly executing the Agreement. The court of appeals also ordered the trial court to resolve contested issues of fact bearing on the validity of the Agreement.[4]

The Moffetts allege that the court of appeals erred when it held that a person possessing a POA has the authority to execute a nursing home arbitration agreement on behalf of his or her incapacitated principal. They argue that the granting of such authority violates the HCAA arbitration provision, section 13–64–403. The Moffetts also contend that the court of appeals impermissibly remanded the case to the trial court for additional fact finding on the issue of whether Briarwood violated subsection 13–64–403(7) of the HCAA by conditioning Dorothy Moffett's medical care on James Moffett's signing the Agreement. We disagree and affirm the judgment of the court of appeals. We need not and do not reach the issue of whether a person holding a medical durable power of attorney is authorized to sign an arbitration agreement on behalf of an incapacitated patient.

## II.

We hold that the HCAA does not prohibit a person possessing a POA from entering into an arbitration agreement on behalf of a person who became incapacitated after executing the POA. We also hold that the trial court must resolve contested factual issues bearing on the validity of the Agreement.

### A. Standard of Review

██ Whether an enforceable agreement to arbitrate exists in a case is a question of law we review de novo. *Lane v. Urgitus,* 145 P.3d 672, 677 (Colo.2006); *Allen v. Pacheco,* 71 P.3d 375, 378 (Colo.2003); *1mage Software, Inc. v. Reynolds & Reynolds Co.,* 459 F.3d 1044, 1055 (10th Cir.2006).

██ We also review issues of statutory construction de novo. *Flood v. Mercantile Adjustment Bureau, LLC,* 176 P.3d 769, 772 (Colo.2008). Our primary task is to ascertain and effectuate the intent of the General Assembly. *People v. Yascavage,* 101 P.3d 1090, 1093 (Colo.2004). We strive to reconcile conflicts between two statutes that regulate the same conduct. *Showpiece Homes Corp. v. Assurance Co. of Am.,* 38 P.3d 47, 53 (Colo. 2001); *see also* § 2–4–205, C.R.S. (2009). We read applicable statutory provisions as a whole in order to give consistent, harmonious, and sensible effect to all their parts. *City of Lakewood v. Mavromatis,* 817 P.2d 90, 96 (Colo.1991).

██ We begin with the plain language of the statute to ascertain the General Assembly's intent. *In re Marriage of Ikeler,* 161 P.3d 663, 666 (Colo.2007). If the plain language is ambiguous, we may look to other factors, such as the goal of the statutory design, in determining legislative intent. *Id.* at 666, 669; § 2–4–203, C.R.S. (2009). When statutory provisions concern the same subject matter or are part of a common design, we must read them together to give full effect to each. *Martinez v. People,* 69 P.3d 1029, 1033 (Colo.2003); *In re People ex rel. M.K.A.,* 182 Colo. 172, 175, 511 P.2d 477, 479 (1973).

██ We generally defer to a trial court's findings of fact if the evidence sup-

---

3. The trial court granted the Moffetts' motion for partial summary judgment, erroneously ruling that there were no issues of material fact regarding the Agreement's validity.

4. With respect to the trial court's third finding, the court of appeals found that a copy of an arbitration agreement need not be given directly to an incapacitated patient. The petition for certiorari did not present this issue.

ports them. *E–470 Pub. Highway Auth. v. 455 Co.,* 3 P.3d 18, 22 (Colo.2000). To the extent the evidence is documentary in nature, we may reach our own conclusions. *Lane,* 145 P.3d at 680 (stating that "[w]hen the record of the agreement we are called upon to construe or enforce consists of documentary evidence, we may base our legal conclusion upon that documentary evidence and do not depend upon a trial court's factual findings or interpretation of that evidence." (citations omitted)); *see also Winslow Constr. Co. v. City & County of Denver,* 960 P.2d 685, 692 n. 11 (Colo.1998). When the evidence does not support a trial court ruling, we may overturn it. *See People v. D.F.,* 933 P.2d 9, 14 (Colo.1997). We construe statutes to avoid absurd results. *Lagae v. Lackner,* 996 P.2d 1281, 1284 (Colo.2000).

### B. The HCAA Does Not Prohibit Delegation of POA Authority

The Moffetts argue that (1) the HCAA prohibits an incapacitated patient from entering into an arbitration agreement and (2) a person holding a POA the patient executed before becoming incapacitated may not enter into an arbitration agreement for a patient who becomes incapacitated. These arguments depend upon an unsupported interpretation of the HCAA.

Key provisions of the HCAA we construe in this opinion are as follows:

Subsection 13–64–403(1):

It is the intent of the general assembly that an arbitration agreement be a *voluntary agreement between a patient and a health care provider* . . . .

(Emphasis added).

Subsection 13–64–403(2):

*Any agreement for the provision of medical services which contains a provision for binding arbitration of any dispute* as to professional negligence of a health care provider *that conforms* to the provisions of this section *shall not be deemed contrary to the public policy of this state, except as provided in subsection (10) of this section.*

(Emphasis added).

Subsection 13–64–403(5):

*Once signed, the agreement shall govern all subsequent provision of medical services for which the agreement was signed until or unless rescinded by written notice.* Written notice of such rescission may be given by a guardian or conservator of the patient if the patient is incapacitated or a minor. Where the agreement is one for medical services to a minor, it shall not be subject to disaffirmation by the minor if signed by the minor's parent or legal guardian.

(Emphasis added).

Subsection 13–64–403(7):

*No health care provider shall refuse to provide medical care services to any patient solely because such patient refused to sign such an agreement or exercised the ninety-day right of rescission.*

(Emphasis added).

Subsection 13–64–403(10):

Even where it complies with the provisions of this section, such an agreement may nevertheless be declared invalid by a court if it is shown by clear and convincing evidence that:

(a) The agreement failed to meet the standards for such agreements as specified in this section; or

(b) The execution of the agreement was induced by fraud; or

(c) The patient executed the agreement as a direct result of the willful or negligent disregard of the patient's right to refrain from such execution; or

(d) The patient executing the agreement was not able to communicate effectively in spoken and written English, unless the agreement is written in his native language.

Thus, it is clear that the HCAA allows arbitration of disputes, but also contains protective provisions curbing abusive practices in obtaining agreements to arbitrate. The HCAA does not expressly address whether a

person holding a POA can validly execute an arbitration agreement on behalf of a person who has become incapacitated. Nonetheless, the language and purposes of the HCAA, combined with Colorado's general preference for arbitration agreements and the statutory design governing POAs, demonstrate the General Assembly's intent to allow a person holding a POA to enter into an arbitration agreement on behalf of an incapacitated patient. Accordingly, for the reasons set forth below, we conclude that the term "patient" as used in section 13–64–403 includes a person acting with legal authority under a POA to enter into such an agreement on behalf of the incapacitated patient.

Section 13–64–403 governs "agreement[s] for the provision of medical services which contain[ ] a provision for binding arbitration of any dispute as to professional negligence of a health care provider." § 13–64–403(2). The General Assembly enacted the HCAA as part of an overall tort reform package in response to rising costs of medical malpractice insurance for health care providers. *See* § 13–64–102(1), C.R.S. (2009). The stated goal of the HCAA is to "assure the continued availability of adequate health care services to the people of this state by containing the significantly increasing costs of malpractice insurance for medical care institutions and licensed medical care professionals...." *Id.*

In accordance with this overall goal, "one purpose of [the HCAA] was to provide [ ] patients with an option to settle their claims in a timely fashion through arbitration." *Colo. Permanente Medical Group, P.C. v. Evans,* 926 P.2d 1218, 1227 n. 17 (Colo.1996) ("*CPMG*") (citing Sen. Ted Strickland, S. Floor Deb. on S.B. 143, 56th Gen. Assemb., 2d Sess. (Feb. 25, 1988)). Viewed in light of this goal, section 13–64–403 provides patients and health care providers an alternative dispute resolution option to limit increasing costs facing the health care industry. This section accords with Colorado's long history of encouraging arbitration as an alternative to litigation. *Lane,* 145 P.3d at 678 ("In Colorado, arbitration is a favored method of dispute resolution."); *Huizar v. Allstate Ins. Co.,* 952 P.2d 342, 346 (Colo.1998).

■■■■ Much of the argument in this case turns on a reading of subsection 13–64–403(1), which states the intent of the legislature "that an arbitration agreement be a voluntary agreement between a patient and a health care provider...." While individuals have the right to a jury trial, our constitution, statutes, and case law support an individual's decision to waive this right and agree to arbitrate instead. Colo. Const. art. XVIII, § 3; Uniform Arbitration Act, §§ 13–22–201 to –230, C.R.S. (2009); *Lane,* 145 P.3d at 678; *Allen,* 71 P.3d at 378 (creating a presumption in favor of arbitration, where we must "resolve doubts about the scope of the arbitration clause in favor of arbitration"). This policy in favor of arbitration applies equally in the healthcare context. *See Rains v. Found. Health Sys. Life & Health,* 23 P.3d 1249 (Colo.App.2001) (applying presumptions in favor of arbitration to insured's claim against a medical insurer).

Nevertheless, the General Assembly was sensitive to the danger of patients entering into arbitration agreements unknowingly or involuntarily. *CPMG,* 926 P.2d at 1227 n. 17 (citing S. Floor Debate on S.B. 143, 56th Gen. Assemb., 2d Sess. (Feb. 25, 1988); Hearing on S.B. 143 before the Sen. Business Affairs and Labor Comm., 56th Gen. Assemb., 2d Sess. (Feb. 15, 1988)). Thus, the legislature mandated that arbitration agreements be voluntary, § 13–64–403(1), and included several safeguards, such as a patient's right to rescind the agreement within ninety days of signing it and the requirement of precise language informing the patient of her rights, § 13–64–403(3)–(4). *See CPMG,* 926 P.2d at 1227 n. 17.

■■■■ The HCAA and Colorado's recognized policy favoring arbitration coexist with well-established statutory and common law doctrines governing agency and POAs. The execution of a POA creates a principal-agent relationship. *In re Trust of Franzen,* 955 P.2d 1018, 1021 (Colo.1998). "A power of attorney is an instrument by which a principal confers express authority on an agent to perform certain acts or kinds of acts on the principal's behalf." *Id.*

POAs executed by individuals in Colorado are governed by the Uniform Power of At-

torney Act ("the UPAA"), sections 15–14–701 to –745, C.R.S. (2009). The General Assembly enacted the UPAA in 2009, which became effective April 1, 2009.[5] The UPAA repeals and replaces several provisions of the predecessor statute governing POAs; however this repeal does not take effect until January 1, 2010.[6] Ch. 188, sec. 1, §§ 15–14–601 to –611, 1994 Colo. Sess. Laws 1068–76 (repealed, effective Jan. 1, 2010). While both the UPAA (effective April 1, 2009) and its predecessor (effective until January 1, 2010) apply to this case, our analysis is the same under either statute.[7] Since both the newly-enacted and repealed statutes apply to this case, we cite to provisions from both throughout this opinion. In addition to the UPAA, the General Assembly has provided a statutory form POA with complete instructions on the interpretation and construction of the statutory form. §§ 15–1–1301 to –1317, C.R.S. (2009).

In adopting these provisions, the General Assembly recognized the right of the individual to appoint an agent to deal with a broad range of personal and financial decisions. § 15–14–500.3(1), C.R.S. (2009); Ch. 188, sec. 1, § 15–14–601(1), 1994 Colo. Sess. Laws 1068 (repealed, effective Jan. 1, 2010). While the actual authority vested in the agent is governed by the POA document itself, § 15–14–726; Ch. 188, sec. 1, § 15–14–603(1), 1994 Colo. Sess. Laws 1070 (repealed, effective Jan. 1, 2010), the statutes demonstrate that a principal may elect to authorize her agent to make very significant decisions, including entering into or rescinding any contract, § 15–1–1304(b); § 15–14–726(b), litigating any claims on behalf of the principal, § 15–1–1304(d); § 15–1–1313(a); § 15–14–735(a),

and submitting to arbitration or settling a claim, § 15–1–1304(d); § 15–1–1313(e); § 15–14–735(e). The person holding the POA is under a legal duty to act in good faith in the best interests of the principal. § 15–14–714(1)–(2); Ch. 188, sec. 1, § 15–14–606, 1994 Colo. Sess. Laws 1072 (repealed, effective Jan. 1, 2010).

### C. Application to this Case

The Moffetts' reading of section 13–64–403 fails to account for the statutory design it is a part of, the statutes governing POAs, and Colorado's policy favoring arbitration. They argue that section 13–64–403 prohibits health care facilities from presenting an arbitration agreement to any patient who is incapacitated or to any person the patient empowered to act on her behalf under a POA. Such an interpretation frustrates the purposes of the HCAA, Colorado's public policy favoring arbitration, and the right of an individual to authorize an agent to act on her behalf should she become incapacitated.

This argument is illogical because one of the primary reasons for executing a POA is so a trusted agent may act in the principal's stead when the principal does not have the ability or desire to do so. We conclude that the term "patient," as used in section 13–64–403, includes a person acting with legal authority under a POA on an incapacitated patient's behalf. The plain language of section 13–64–403 does not expressly prohibit or authorize the exercise of a POA on the patient's behalf. Because the statute is ambiguous, we must read it in light of other considerations, such as the legislative purpose, the consequences of a particular construction, and other statutes dealing with the same

---

5. The UPAA applies to POAs executed previously where, as in this case, application of the UPAA does not "substantially interfere with the effective conduct of the judicial proceeding or prejudice the rights of a party." § 15–14–745(1)(c); *see also* § 15–14–745(1)(a).

6. The parts of the predecessor statute that remain after January 1, 2010 will only apply to POAs executed by entities. *See* § 15–14–602(4), C.R.S. (2009) (effective Jan. 1, 2010).

7. The newly-enacted UPAA more thoroughly outlines the authorities and duties of agents acting pursuant to a POA; nonetheless our analysis is

the same under both the UPAA and the predecessor statutes. The General Assembly's legislative declarations for the statutes are almost identical. § 15–14–500.3, C.R.S. (2009); § 15–14–601 (repealed, effective Jan. 1, 2010). Under both the predecessor and the UPAA, the specific provisions of the POA determine the authority of the agent. *See* § 15–14–726; § 15–14–603(1). Likewise, the section of the UPAA governing the authority of a POA in claims and litigation is substantially the same as the section dealing with the same authority in the statutory form POA. § 15–14–735(1)(e); § 15–1–1313(1)(e), C.R.S. (2009).

subject. *See* § 2–4–203; *In re Marriage of Ikeler,* 161 P.3d at 666, 669.

Subsection 13–64–403(1) states: "It is the intent of the general assembly that an arbitration agreement be a voluntary agreement between a *patient* and a health care provider. . . ." (emphasis added). The Moffetts argue that the use of the word "patient" in subsection 13–64–403(1) illustrates a legislative intent that the agreements only be enforceable when entered into by the patient herself. However, such a narrow reading is contrary to our prior interpretation of this very subsection.

In *CPMG,* 926 P.2d at 1227 n. 16, Kaiser argued that the specific requirements of section 13–64–403 did not apply to it because it was an HMO, which is not within the definition of "health care provider" under subsection 13–64–403(1). But, we held that the purpose of subsection 13–64–403(1) is to ensure that arbitration agreements are entered into voluntarily. *Id.* at 1227 n. 16. Nothing in that subsection demonstrates intent to narrow section 13–64–403's applicability. *Id.* The scope of the statute is governed by subsection 13–64–403(2), which makes clear that section 13–64–403 "applies to *any agreement* providing for the arbitration of medical malpractice claims, irrespective of the capacities of the parties to the agreement." *Id.* at 1225–26 (emphasis in original).

 Nothing in the case before us leads us to depart from our prior reading of section 13–64–403. As in *CPMG,* subsection 13–64–403(2) clarifies that the Agreement in this case should not be invalidated, provided that Dorothy Moffett's care was not illegally conditioned on James Moffett signing the Agreement in violation of subsection 13–64–403(7) or subsection 13–64–403(10). The Agreement contains the procedural safeguards required by the HCAA, including the detailed requirements of subsections 13–64–403(3) and (4).[8] Moreover, James Moffett did not rescind or attempt to exercise his mother's right to rescind the Agreement, on her behalf, within the statutorily provided ninety-

day rescission period. *See* § 13–64–403(4)–(5).

A reading of subsection 13–64–403(1) that limits the ability of a person to appoint an agent who may agree to arbitrate also fails to account for established statutory and common law principles of agency. As discussed above, an individual has the right to delegate authority to an agent by executing a POA. § 15–14–500.3; § 15–14–601(1)(repealed, effective Jan. 1, 2010). While the authority vested in the agent is governed by the POA itself, the General Assembly clearly anticipated that an agent holding a POA can relinquish or enforce the legal rights of the principal. *See* §§ 15–14–726 to –740; §§ 15–1–1301 to –1317.

Absent reservation or limitation in the governing POA in this case, which the Moffetts have not yet demonstrated, James Moffett had the authority under the POA to waive the right to a jury trial and submit to arbitration on behalf of his mother. Indeed, under the newly-enacted UPAA, an agent is authorized to submit to arbitration unless the POA specifically limits this authority. § 15–14–735(1); *see also* § 15–1–1313 (asserting that a statutory form POA that includes language relating to claims and litigation empowers the agent to "submit to arbitration" on the principal's behalf).

Contrary to the Moffetts' argument, we are not convinced that subsection 13–64–403(11) leads to a different conclusion. That provision states: "No such [arbitration] agreement may be submitted to a patient for approval when the patient's condition prevents the patient from making a rational decision whether or not to execute such an agreement." Rather, subsection 13–64–403(11) makes clear that a health care facility cannot validly ask an incapacitated patient herself to sign an agreement. The common sense reading of this provision is that the health care facility must present the proposed arbitration agreement to the person who holds the POA, if the patient has executed such an instrument and later becomes

---

8. Subsections 13–64–403(3) and (4) require that an arbitration agreement submitted to a patient include specific language informing the patient that the agreement is entirely voluntary, that

medical services cannot be conditioned on the patient agreeing to arbitrate, and that the patient has a right to rescind the agreement within ninety days of signing it.

incapacitated. When read together with the other provisions of section 13–64–403, this provision seeks to ensure that arbitration agreements are voluntary and not entered into by fraud or duress. *See* § 13–64–403(1), (3), (4), (10); *see also CPMG*, 926 P.2d at 1227 n. 17. Thus, we do not read subsection 13–64–403(11) as prohibiting a health care facility from submitting an arbitration agreement to the legally authorized representative of the incapacitated patient, who acts under a legal duty to make decisions in the best interests of the incapacitated principal. *See* § 15–14–714; § 15–14–606 (repealed, effective Jan. 1, 2010). The General Assembly intended that a person, anticipating a possible incapacity in the future, may lawfully execute a POA authorizing her agent to enter into an arbitration agreement on her behalf.

Likewise, subsection 13–64–403(5) does not change our reading of section 13–64–403. That provision addresses the rescission of arbitration agreements entered into by incapacitated and minor patients, stating that an arbitration agreement shall govern until rescinded and that "[w]ritten notice of such rescission may be given by a guardian or conservator of the patient if the patient is incapacitated or a minor." § 13–64–403(5).[9] While subsection 13–64–403(5) does not expressly address whether a legal representative (conservator, guardian, or, for purposes of this case, a person holding a POA) can enter these agreements in the first instance, this provision acknowledges that legal representatives are permitted to act on behalf of a patient when the patient is unable to act for herself. We do not read this provision, dealing specifically with the *rescission* of arbitration agreements, as having any effect on who may *enter* into agreements on the patient's behalf.

We also do not read subsection 13–64–403(5)'s use of the words "guardian or conservator" to limit who may act on behalf of a patient under section 13–64–403. Unlike court-appointed guardians or conservators, *see* § 15–14–301, C.R.S. (2009); § 15–14–401, C.R.S. (2009), the individual herself selects the person empowered to act on her behalf through a POA, *see* § 15–14–500.3; § 15–14–601 (repealed, effective Jan. 1, 2010). The authority of the agent is as broad or as narrow as the POA provides. *See* § 15–14–726; § 15–14–603(1).

Like guardians and conservators, persons holding POAs have an enforceable legal duty to act in the best interests of their principal. *See* § 15–14–714 (duties of attorneys-in-fact); § 15–14–606 (repealed, effective Jan. 1, 2010) (duties of attorneys-in-fact); § 15–14–314, C.R.S. (2009) (duties of guardians); § 15–14–418, C.R.S. (2009) (duties of conservators). By designating an attorney-in-fact in advance of incapacity, a person can avoid the expensive and time-consuming process of having a court appoint a representative for her. The General Assembly did not intend in enacting section 13–64–403 to negate the patient's personal selection of a legal representative for purposes of making decisions the patient has entrusted to the agent.

The Moffetts argued at oral argument that conservators and guardians are legally superior to POAs, and therefore that the General Assembly must have intended to narrow who may act on behalf of a patient by only naming conservators and guardians in subsection 13–64–403(5). The characterization of guardians and conservators as "superior" is an oversimplification. Instead, the three mechanisms offer different options for empowering a third party to act on behalf of an incapacitated person. A conservator is appointed by the court to manage the business and property affairs of a protected person, as determined necessary by the court, *see* § 15–14–401, and a guardian is appointed by the court to manage an incapacitated person's (or "ward's") health, welfare, and other personal decisions, *see* § 15–14–314. Conservators' and guardians' powers are subject to limitation by the court and the court is directed to only provide authority that is necessitated by the ward or protected person's incapacity. *See* § 15–14–311(b)(2), C.R.S. (2009); § 15–14–410, C.R.S. (2009). On the other hand, the principal selects an

---

9. The provision also provides that a minor may not disaffirm an agreement signed by his or her parent or legal guardian.

agent under a POA prior to incapacity, and the agent has the authority the principal would have had, subject to any limitation the principal deems appropriate. *See* § 15–14–726; § 15–14–603(1).

To the extent that the appointment of multiple representatives occurs, there is potential for overlap and shared responsibility. Courts are instructed to prioritize attorneys-in-fact during conservator and guardian appointment proceedings, § 15–14–310(1)(b)–(d), C.R.S. (2009); § 15–14–413(1)(b)–(c), C.R.S. (2009), and attorneys-in-fact are required to consult with the guardian or conservator on financial matters, Ch. 106, sec. 16, § 15–14–609(3)(a), 2009 Colo. Sess. Laws 425–26 (repealed, effective Jan. 1, 2010); § 15–14–714(8). Conservators have the authority to revoke any part of a POA as it relates to financial matters, and guardians may revoke some powers relating to personal decisions. § 15–14–609(1)(b)–(c) (repealed, effective Jan. 1, 2010); *see* § 15–14–708(2). Nonetheless, conservators and guardians are appointed by a court when the attorney-in-fact is not acting in the best interests of the principal, *see* § 15–14–609(1)(a) (repealed, effective Jan. 1, 2010), or otherwise lacks the necessary authority to fully manage the incapacitated person's affairs, *see* § 15–14–401(1)(b) (identifying when a court may appoint a conservator); § 15–14–311 (identifying when a court may appoint a guardian). While the mechanisms for legal representation may interact, they offer different options for managing the affairs of an incapacitated person.

To read attorneys-in-fact out of the HCAA would render the entire statutory design for agency ineffective. We must read statutory provisions harmoniously to give full effect to each if possible. *Martinez*, 69 P.3d at 1033. The legislature is presumed to intend that the various parts of a comprehensive statutory design are consistent with and apply to each other, without having to incorporate each by express reference in the other statutory provisions. *Id.* The HCAA coexists with Colorado's well-established doctrine of agency, whereby an attorney-in-fact is permitted, when authorized, to act for his principal in any transaction in which the principal

himself may act. § 15–14–500.3; §§ 15–14–726 to –740; *see also* § 15–14–601 (repealed, effective Jan. 1, 2010); §§ 15–1–1301 to –1317. Under the statutes governing agency, the General Assembly expressly permits an agent authorized by a POA to waive a principal's right to a jury trial and submit to arbitration, and also to execute or rescind contracts on the principal's behalf. *See* § 15–14–726; § 15–14–735; § 15–14–601 (repealed, effective Jan. 1, 2010); § 15–1–1313.

In sum, section 13–64–403 cannot be read without regard for the extensive statutory and common law doctrine permitting authorized agents to bind principals in all kinds of contracts, including arbitration agreements. As the court of appeals observed in this case, limiting the definition of "patient" in the HCAA to preclude an agent acting on the patient's behalf under a POA would frustrate the purpose of many properly executed POAs. *Moffett*, 187 P.3d at 1145. If we were to narrowly interpret the term "patient" to exclude a person holding a POA on behalf of the patient, we would render the statutes governing POAs ineffective, contrary to the General Assembly's intent. *See* § 15–14–726; § 15–14–735; § 15–14–601 (repealed, effective Jan. 1, 2010); §§ 15–1–1301 to –1317.

Absent an express statement by the legislature to the contrary, we read section 13–64–403 of the HCAA to allow delegations of authority between a principal and agent under the statutes governing POAs. *See* §§ 15–14–701 to –745; §§ 15–14–601 to –610 (repealed, effective Jan. 1, 2010); §§ 15–1–1301 to –1317; *see also In re People ex rel. M.K.A.*, 182 Colo. at 175, 511 P.2d at 479 (requiring that two statutes be read together to give full effect to each).

Contrary to the Moffetts' argument, *HealthONE v. Rodriguez ex rel. Rodriquez*, 50 P.3d 879 (Colo.2002), is inapplicable here. In that case, we addressed a constitutional challenge to a specific provision of the HCAA, section 13–64–205(1)(f)(II), C.R.S. (2002) (amended 2007), which limited the ability of incapacitated patients to elect lump-sum payments of judgments. Not only is the lump-sum provision in that case very different from the arbitration provision at issue here,

the meaning of that provision was not disputed in that case.

James Moffett held a POA executed by his mother before she became incapacitated. Absent a restriction or limitation on his authority under the POA he holds, he was authorized to enter into the Agreement on behalf of his mother. The court of appeals properly directed the trial court to determine, on remand, whether the POA Dorothy Moffett executed and James Moffett admits he possessed had any material limitation applicable to this case. As the party contesting the POA's efficacy, the Moffetts have the burden of showing it contains any such limitation.

### D. Subsection 13–64–403(7) Voluntariness

 The trial court ruled that "James Moffett was impermissibly told that if he did not sign [the Agreement] his mother would be refused and denied urgently needed care by [Briarwood] in violation of 13–64–403(7)." However, the trial court relied solely on James Moffett's affidavit and held no evidentiary hearing regarding evidence disputing Moffett's version of the facts. The court of appeals remanded for evidentiary proceedings on this issue, holding that there were genuine issues of material fact in regard to whether Briarwood had violated subsection 13–64–403(7). We agree.

Subsection 13–64–403(7) prohibits a health care facility from refusing medical care to a patient because she declines to sign an arbitration agreement or exercises her right to rescind the agreement within ninety days. Likewise, subsection 13–64–403(10)(b) permits a court to declare an agreement invalid if fraud induced the execution of the agreement.

 As between the trial court and the arbitrator, the trial court must resolve any allegation that the arbitration agreement is invalid. *J.A. Walker Co., Inc. v. Cambria Corp.*, 159 P.3d 126, 130 (Colo.2007). The trial court is permitted to "proceed summarily" to decide whether the agreement is valid. *Id.*; § 13–22–207(1)(b) (governing motions to stay and compel arbitration). A summary

proceeding "is an expedited process that starts with a trial court considering affidavits, pleadings, discovery, and stipulations submitted by the parties. The court must determine whether material issues of fact are disputed and, if such factual disputes exist, it must conduct an expedited evidentiary hearing to resolve the dispute." *J.A. Walker*, 159 P.3d at 130 (internal quotations and citations omitted).

In *J.A. Walker*, we held that the trial court failed to follow these required summary proceeding procedures when it considered the plaintiff's fraudulent inducement challenge of an arbitration agreement. The trial court had compelled arbitration after reviewing a prime contract, subcontract, and three affidavits. Nonetheless, because it was unclear whether the trial court had considered the fraudulent inducement challenge at issue in that case, we ordered the trial court to do so on remand.

Here, James Moffett submitted an affidavit claiming that Dorothy Moffett's care was conditioned upon his signing the Agreement. Relying only on the affidavit and without holding an expedited evidentiary hearing, the trial court ruled the Agreement invalid. However, the Agreement made explicit that it was binding on all disputes arising out of Dorothy Moffett's stay and the care provided by Briarwood, including disputes brought by her successors and assigns. The Agreement stated in bold, capital lettering, as required by subsections 13–64–403(3) and (4), that care was not conditioned on the execution of the Agreement and the patient had the right to rescind the Agreement within ninety days of signing it. *See, e.g., Cordillera Corp. v. Heard*, 41 Colo.App. 537, 540, 592 P.2d 12, 14 (1978), *aff'd*, 200 Colo. 72, 612 P.2d 92 (1980) (holding that a party that signed an agreement with an arbitration provision was presumed to have read and to be aware of that provision). Moreover, the Agreement was separate from Briarwood's admission agreement, and James Moffett signed it two days after his mother was admitted to Briarwood.

The evidence and contested issues in this case reveal material facts in dispute. We conclude that the trial court failed to follow

the procedures set forth in *J.A. Walker*. *See* 159 P.3d at 130.

### III.

Accordingly, we affirm the judgment of the court of appeals.

Justice BENDER does not participate.