The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 4, 2026

## 2026 COA 46

**No. 25CA0491, *Reno v. Continuum at Sharmar, Inc.* — Health and Welfare — Health Care Availability Act — Arbitration Agreements; Agency — Principal-Agent Relationship — Medical Durable Power of Attorney — Actual Authority — Apparent Authority**

A division of the court of appeals holds that a medical durable power of attorney (MDPOA) does not confer authority on the agent to enter into an arbitration agreement on behalf of her principal unless the MDPOA expressly grants that authority. Applying this holding, the division affirms the district court's denial of a health care facility's motion to compel arbitration.

COLORADO COURT OF APPEALS **2026 COA 46**

Court of Appeals No. 25CA0491
Pueblo County District Court No. 24CV30331
Honorable Michelle Chostner, Judge

Vicki Reno, individually and as Personal Representative of the Estate of
Marjorie Henderson, deceased,

Plaintiff-Appellee,

v.

Continuum at Sharmar, Inc. d/b/a Sharmar Village Care Center, Inc.,

Defendant-Appellant.

ORDER AFFIRMED

Division VI
Opinion by JUDGE BERGER*
Gomez and Moultrie, JJ., concur

Announced June 4, 2026

Reddick Law, PLLC, Brian D. Reddick, Matthew D. Swindle, Heather G.
Zarchary, Little Rock, Arkansas, for Plaintiff-Appellee

Hall & Evans, L.L.C., David B. Gelman, Jared R. Ellis, Denver, Colorado, for
Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1　Defendant, Continuum at Sharmar, Inc. d/b/a Sharmar Village Care Center, Inc. (Sharmar), appeals the district court's order denying its motion to compel arbitration with plaintiff, Vicki Reno, individually and as personal representative of the Estate of Marjorie Henderson.  We affirm the order.

¶ 2　Following the analysis in *Lujan v. Life Care Centers of America*, 222 P.3d 970 (Colo. App. 2009), and *Fresquez v. Trinidad Inn, Inc.*, 2022 COA 96, but disagreeing with one of the holdings in *Moffett v. Life Care Centers of America*, 187 P.3d 1140 (Colo. App. 2008) (*Moffett I*), *aff'd on other grounds*, 219 P.3d 1068 (Colo. 2009) (*Moffett II*), we hold that a medical durable power of attorney (MDPOA) does not confer authority on the agent to enter into an arbitration agreement with a health care provider on behalf of the principal unless that authority is expressly stated in the MDPOA.

I.　Relevant Facts and Procedural History

¶ 3　In 2014, Marjorie Henderson signed an MDPOA, appointing one of her daughters, Brenda Wills, as her attorney-in-fact.[1]  The

---

[1] We use the terms "attorney-in-fact" and "agent" interchangeably throughout this opinion.

MDPOA specified the scope of actions Wills was authorized to take on Henderson's behalf, including giving Wills authority

> (1) to act for her "in all matters relating to [Henderson's] health care";
>
> (2) "to consent . . . to all medical, surgical, hospital, and related health care treatments and procedures on [Henderson's] behalf";
>
> (3) "to sign any documents required to request [release from a facility]. . . or to be released . . . to another facility";
>
> (4) "to provide . . . consent to health care treatments or procedures on [Henderson's] behalf"; and
>
> (5) "to authorize [Henderson's] admission to or transfer from a health care facility."

¶ 4     The MDPOA specifically prohibited Wills from acting for Henderson "for any other purpose unrelated to [her] health care."  It authorized Wills to act on Henderson's behalf once the MDPOA was signed.  It also provided that the power became effective when Henderson had been determined "to be incapable of providing

2

informed consent for medical treatment and surgical and diagnostic procedures."[2]

¶ 5      Henderson was admitted to Sharmar's nursing home in Pueblo nearly one decade after she signed the MDPOA. Henderson, Wills, and a Sharmar representative initially met to sign the admission paperwork. Henderson left midway through the meeting to attend another appointment, and Wills completed the paperwork alone, including signing the arbitration agreement.

¶ 6      Arbitration agreements between patients and health care providers are governed by Colorado's Health Care Availability Act (HCAA). §§ 13-64-101 to -503, C.R.S. 2025. The HCAA mandates that health care arbitration agreements be voluntary, contain several disclosures, and be subject to rescission for any reason within three months of signing. § 13-64-403(1), (3)-(4), C.R.S. 2025. Sharmar's arbitration agreement contained the mandatory disclosures — including a disclaimer that no health care providers

---

[2] Because of our disposition of this appeal, we need not consider whether these terms regarding the effective date of the MDPOA are inconsistent or whether any inconsistency bears on the dispositive question in this case.

are allowed to refuse services to a patient solely because they refused to sign an arbitration agreement. § 13-64-403(4), (7).[3]

¶ 7    The agreement provided that "any legal dispute, controversy, demand, or claim . . . that arises out of or relates to the Admissions Agreement or any service or health care provided by [Sharmar] to [Henderson]" would be arbitrated. The arbitration agreement encompassed any claims of wrongful death, negligence, gross negligence, or other "departure[s] from accepted standards of medical or health care or safety," and it extended to Henderson's heirs.

¶ 8    Approximately one month after Henderson was admitted to Sharmar, she suffered two falls in roughly forty-eight hours. Doctors determined palliative care was the best course of action based on her injuries, and she died three days after her first fall.

¶ 9    Following Henderson's death, Vicki Reno, another of Henderson's daughters and the personal representative of Henderson's estate, sued Sharmar and its administrator for

---

[3] There is no dispute that Wills signed the admission paperwork, including the arbitration agreement.

negligence, violations of the Colorado Consumer Protection Act, and wrongful death.

¶ 10     Sharmar moved to compel arbitration and stay proceedings based on the arbitration agreement signed by Wills. Reno opposed the motion, arguing the agreement was invalid because Wills had no authority to enter into an arbitration agreement on behalf of Henderson.

¶ 11     Limited discovery was conducted regarding the scope of Wills's authority and the circumstances under which the arbitration agreement was signed. Without holding an evidentiary hearing, the district court denied Sharmar's motion to compel arbitration, ruling that the MDPOA did not grant Wills the authority to enter into the arbitration agreement on Henderson's behalf and that Wills did not have actual or apparent authority to do so based on her words or actions.

¶ 12     Sharmar appeals, arguing that the district court (1) misinterpreted the scope of Wills's MDPOA; (2) erroneously determined Wills lacked actual or apparent authority to execute the arbitration agreement; and (3) failed to address Sharmar's argument that Reno was estopped from challenging the validity of

the arbitration agreement.  We address and reject each contention below.

## II.  Standard of Review

¶ 13   In considering a motion to compel arbitration, the district court must determine whether a valid agreement to arbitrate exists between the parties and whether the issues being disputed are within the scope of the arbitration agreement.  *Vallagio at Inverness Residential Condo. Ass'n v. Metro. Homes, Inc.*, 2015 COA 65, ¶ 14, *aff'd*, 2017 CO 69.  The court may refuse to compel arbitration "only upon a showing that there is no agreement to arbitrate or if the issue sought to be arbitrated is clearly beyond the scope of the arbitration provision."  *Id.* (quoting *Eychner v. Van Vleet*, 870 P.2d 486, 489 (Colo. App. 1993)).  An agreement is invalid when an agent, acting on a principal's behalf, did not have the authority to enter into the agreement.  *See Wilson v. Mosko*, 130 P.2d 927, 928 (Colo. 1942).

¶ 14   Whether an enforceable agreement to arbitrate exists, and if so, the scope of that agreement, is a question of law we review de novo.  *Moffett II*, 219 P.3d at 1072; *N.A. Rugby Union LLC v. U.S. Rugby Football Union*, 2019 CO 56, ¶ 19.  However, "[w]hether an

6

agency relationship exists generally is a question of fact, though the court may decide the question as one of law when the facts are undisputed." *Villalpando v. Denv. Health & Hosp. Auth.*, 181 P.3d 357, 363 (Colo. App. 2007).

### III. The Medical Durable Power of Attorney Did Not Invest Wills with Authority to Enter into a Voluntary Arbitration Agreement

¶ 15 Sharmar argues that the district court erred when it determined as a matter of law that the MDPOA Henderson signed did not authorize Wills to enter into the arbitration agreement. We disagree.

#### A. Health Care Arbitration Agreements

¶ 16 Colorado favors arbitration agreements. *See J.A. Walker Co. v. Cambria Corp.*, 159 P.3d 126, 128 (Colo. 2007). But health care arbitration agreements, unlike other types of arbitration agreements, are subject to the strict requirements set forth in the HCAA. *See* § 13-64-403. Although the HCAA allows arbitration of disputes, it "also contains protective provisions curbing abusive practices in obtaining agreements to arbitrate." *Moffett II*, 219 P.3d at 1073. Section 13-64-403 requires that parties enter into an arbitration agreement voluntarily and, relatedly, that a patient's

7

admission to a health care facility cannot be solely conditioned upon the signing of an arbitration agreement. § 13-64-403(4), (7).

### B.  Principal-Agent Relationships

¶ 17   There are several ways to create a principal-agent relationship, but it is essentially "a legal relation having its source in the mutual consent of the parties" that results in the agent acting with legal consequence on behalf of the principal. *Stortroen v. Beneficial Fin. Co. of Colo.*, 736 P.2d 391, 395 (Colo. 1987).

¶ 18   One way to establish a principal-agent relationship is through execution of a power of attorney. *Lujan*, 222 P.3d at 973. A power of attorney is a document by which one party, as principal, appoints another as agent and confers upon the latter the authority to perform certain specified acts or kinds of acts on behalf of the principal. *Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo. 1994). In Colorado, the use and interpretation of powers of attorney are governed by statute, *In re Tr. of Franzen*, 955 P.2d 1018, 1021 (Colo. 1998), while the document defines the extent of the agent's express authority, *Willey*, 876 P.2d at 1264. It is undisputed that Henderson did not grant Wills a general or unlimited power of attorney.

¶ 19 Henderson did, however, grant an MDPOA to Wills. An MDPOA grants an agent powers "in consenting to or refusing medical treatment" on behalf of a principal. § 15-14-506(1), C.R.S. 2025. The MDPOA governing statute defines "medical treatment" as the "provision, withholding, or withdrawal of any health care, medical procedure . . . or service to maintain, diagnose, treat, or provide for a patient's physical or mental health or personal care." § 15-14-505(7), C.R.S. 2025.

## C. An Agent's Scope of Authority

¶ 20 Sharmar contends the district court erroneously relied on *Fresquez*, ¶ 46, in concluding that the MDPOA did not include the authority to enter into the arbitration agreement because it did not expressly authorize Wills to enter into an arbitration agreement. According to Sharmar, the court should have instead applied *Moffett I* because *Moffett I*'s factual circumstances, a principal-agent relationship arising out of an MDPOA, and its legal holding, that an MDPOA agent's authority to enter into an arbitration agreement when executing medical facility admissions forms is assumed unless otherwise restricted, are directly on point. *See* 187 P.3d at 1147.

9

¶ 21　　In *Moffett I*, unlike this case, the patient had executed *two* separate powers of attorney — a general power of attorney and an MDPOA.  *Id.* at 1141.  The *Moffett I* division held that "absent a limitation in the [MDPOA], an attorney-in-fact can make exactly the same types of medical treatment decisions that the principal could make if he or she had the mental capacity to do so."  *Id.* at 1145.  Applying that general principle, the division concluded that a person who holds an MDPOA has the power to execute any applicable admission forms, including arbitration agreements, unless that power is restricted by the principal.  *Id.* at 1147.  Put another way, under *Moffett I*, an MDPOA need not expressly grant authority for the agent to execute an arbitration agreement in connection with the patient's admission to a long-term health care facility; the power to agree to arbitration is subsumed in the powers granted by the MDPOA.  *Id.*

¶ 22　　In *Moffett II,* the supreme court affirmed the judgment of the division in *Moffett I* on the basis of the *general* power of attorney that the patient had executed.  219 P.3d at 1071.  But the supreme court expressly stated that "we need not and do not reach the issue of whether a person holding [an MDPOA] is authorized to sign an

arbitration agreement on behalf of an incapacitated patient." *Id.* Thus, the supreme court did not address the holding in *Moffett I* on which Sharmar relies in this case.

¶ 23    In *Lujan*, Judge (now Justice) Gabriel, writing for a division of this court, addressed whether a person holding a health care proxy under sections 15-18.5-103 and -104, C.R.S. 2009, had the authority to agree to an arbitration agreement on behalf of an incapacitated person. 222 P.3d at 972-78. The division analyzed whether the statute's grant of authority for "the provision, withholding, or withdrawal of any health care, medical procedure . . . or service to maintain diagnose, treat, or provide for a patient's physical or mental health or personal care" authorized the proxy to execute an arbitration agreement. *Id.* at 973 (quoting § 15-14-505(7)). The division held that it did not and affirmed the district court's invalidation of the arbitration agreement at issue. *Id.* at 973-78.

¶ 24    More recently, in *Fresquez*, another division of this court held that an agent does *not* possess the authority to enter into a voluntary arbitration agreement unless the principal expressly grants that power. *Fresquez*, ¶ 4.

11

¶ 25    We recognize the factual differences between *Lujan* and *Fresquez*, on the one hand, and this case, on the other hand. *Lujan* analyzed whether a person holding a health care proxy — a status provided by statute, not by the consent of the principal — had the authority to execute an arbitration agreement. 222 P.3d at 972-78. There was no MDPOA in *Lujan*. Similarly, in *Fresquez*, there was no MDPOA or other written power of attorney at all — the court analyzed the words and conduct of the patient. *Fresquez*, ¶¶ 26-36. Nevertheless, the extensive analyses contained in both *Lujan* and *Fresquez* are essential in analyzing whether the grant of authority under an MDPOA includes the execution of an arbitration agreement.    The division in *Fresquez* held:

> [A]n agent's actual authority to make health care decisions for a patient and to sign the documents necessary to admit the patient to a health care facility does not encompass the authority to bind the patient to an arbitration agreement, unless the patient has granted the agent an unlimited power of attorney or otherwise clearly granted the agent the specific authority to bind the patient to an arbitration agreement.

*Id.* at ¶ 46.

¶ 26    The question in this case is whether the execution of a voluntary arbitration agreement constitutes "medical treatment" within the meaning of the MDPOA statute. Although factually distinguishable, both *Lujan* and *Fresquez* convincingly demonstrate that the answer is "no." For several reasons, we conclude that the district court did not err in invalidating the MDPOA notwithstanding *Moffett I.*

¶ 27    First, the out-of-state cases relied on by *Moffett I* have since been substantially distinguished or disapproved. 187 P.3d at 1145-47. The first out-of-state case relied on by the *Moffett I* division was *Owens v. National Health Corp.*, 263 S.W.3d 876 (Tenn. 2007), *overruled on other grounds by, Welch v. Oaktree Health & Rehab. Ctr. LLC,* 674 S.W.3d 881 (Tenn. 2023). In that case, the Tennessee Supreme Court concluded that the decision to admit a patient to a nursing home constituted a medical treatment decision and upheld the enforceability of an arbitration agreement. *Id.* at 883-85. But in 2024, the Tennessee Supreme Court distinguished *Owens* on the basis that Owens's arbitration agreement had been a condition for providing health care. *Williams v. Smyrna Residential, LLC,* 685 S.W.3d 718, 725-26 (Tenn. 2024). As noted above, in Colorado, the

13

provision of medical treatment cannot be conditioned on the execution of an arbitration agreement.

¶ 28 Additionally, the California cases relied on by *Moffett I* have been disapproved. In *Harrod v. Country Oaks Partners, LLC*, the California Supreme Court held that an agent's authority under an MDPOA to make "health care decisions" — a statutorily defined term — prohibited the agent from executing a voluntary arbitration agreement. 544 P.3d 1138, 1152-53 (Cal. 2024) (disapproving *Garrison v. Superior Ct.*, 33 Cal. Rptr. 3d 350 (Ct. App. 2005), and *Hogan v. Country Villa Health Servs.*, 55 Cal. Rptr. 3d 450 (Ct. App. 2007).

¶ 29 Other out-of-state cases have similarly distinguished between an MDPOA agent's authority to make health care decisions and the execution of a voluntary arbitration agreement. *See Miss. Care Ctr. of Greenville, LLC v. Hinyub*, 975 So. 2d 211, 217-19 (Miss. 2008); *Arredondo v. SNH SE Ashley River Tenant, LLC*, 856 S.E.2d 550, 558 (S.C. 2021); *Life Care Ctrs. of Am. v. Smith*, 681 S.E.2d 182, 185-86 (Ga. Ct. App. 2009); *Coleman v. United Health Servs. of Ga., Inc.*, 812 S.E.2d 24 (Ga. Ct. App. 2018).

14

¶ 30    A recent decision of the Wyoming Supreme Court is directly on point. *Miller v. Life Care Ctrs. of Am., Inc.*, 2020 WY 155, ¶ 3. There, a principal executed an MDPOA to appoint an agent to act on her behalf when she was determined "incapable of providing informed consent" in certain circumstances. *Id.* The agent was given the statutory authority to "make health care decisions for [the principal] in accordance with what [the principal's] agent determines to be in [the principal's] best interest" should the principal's wishes be unknown. *Id.* at ¶ 21 (compare with § 15-14-506(2), C.R.S. 2025).

¶ 31    As in the other out-of-state cases, the *Miller* court reasoned that because a voluntary arbitration agreement was not necessary for the provision of health care, entering into an arbitration agreement was not a health care decision. *Id.* at ¶¶ 27-34. Therefore, the agent's authority to make health care decisions did not constitute authority to enter into a voluntary arbitration agreement related to admission to a nursing home. *Id.*

¶ 32    Second, *Fresquez* appropriately focuses on the nature of a *voluntary* arbitration agreement. *Fresquez*, ¶¶ 37-46. Whether a different result would be mandated if an arbitration agreement were

15

a condition of admission to a medical facility is not before us because the HCAA prohibits such mandatory arbitration agreements. § 13-64-403(4), (7).

¶ 33    Third, we believe that the *Fresquez* court's analysis is more consistent with the concerns that led the General Assembly to enact the HCAA. When, as is the case in Colorado, an arbitration agreement has been untethered to the patient's admission to the medical facility, the relationship of the arbitration agreement to health care decisions made by the agent is tenuous and supports the *Fresquez* division's holding. *See Fresquez*, ¶ 45 ("The General Assembly's decision to delink the concept of arbitration from the concept of providing medical services underscores that granting an agent authority to make medical care decisions for a patient does not authorize the agent to waive the patient's right to seek relief in a court of law.").

¶ 34    Accordingly, we apply *Lujan*'s and *Fresquez*'s analyses of what constitutes a medical treatment decision and hold that an MDPOA does not grant authority to the agent to enter into an arbitration

agreement unless such authority is expressly stated in the MDPOA.[4]

### IV. Actual and Apparent Authority

¶ 35 Sharmar next maintains that the district court erred in ruling Wills also lacked actual or apparent authority to enter into an arbitration agreement with Sharmar. We reject both contentions.

¶ 36 A principal-agent relationship can be established by the conduct of the parties. *W. Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 575 (Colo. App. 2006). "An agent can make his principal responsible for his actions if he is acting pursuant to either actual or apparent authority . . . ." *Willey*, 876 P.2d at 1264.

¶ 37 Actual authority is premised on "a principal's expressive conduct toward an agent, through which the principal manifests assent to be affected by the agent's action, and the agent's reasonable understanding of the principal's manifestation."

---

[4] Because of our conclusion, we need not address whether the district court was required to apply *Moffett I*. While trial courts are bound by holdings in published court of appeals opinions, *see* C.A.R. 35(e), one division of the court of appeals is not bound by the decision of a prior division. *People in Interest of M.B.*, 2020 COA 13, ¶ 21. Because we hold that the district court correctly invalidated the arbitration agreement, it is immaterial whether the court should have followed *Moffett I*.

17

Restatement (Third) of Agency § 2.01 cmt. c (A.L.I. 2006). Actual authority includes both express and implied authority. *Willey*, 876 P.2d at 1264. Actual authority may be either express, as when the principal directly states that the agent has the authority to perform a particular act on the principal's behalf, or implied, as when an agent's acts are incidental to or necessary to accomplish the main authority the principal has expressly delegated to the agent. *Fresquez*, ¶ 21.

¶ 38 Apparent authority, in contrast, "is the power held by an agent or other actor to affect a principal's legal relations with third parties *when a third party reasonably believes* the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (emphasis added). "Apparent authority . . . 'flows only from the acts and conduct of the principal.'" *State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 20 (citation omitted). It is "established by proof of 'written or spoken words or other conduct of the principal which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his behalf by a person

purporting to act for him.'" *Villalpando*, 181 P.3d at 363 (citation omitted).

## A. Actual Authority

¶ 39 Sharmar claims that Wills possessed express actual authority to enter into an arbitration agreement on Henderson's behalf. To the extent this argument is based on the MDPOA, we reject it for the reasons stated above.

¶ 40 Apart from the language of the MDPOA, there is no evidence in the record that would support a finding that Wills had express authority to execute the arbitration agreement. Despite the limited discovery authorized by the district court and the depositions taken, Sharmar points to no evidence that Henderson granted express authority to Wills to execute the arbitration agreement.

¶ 41 Sharmar's implied authority argument also fails. Sharmar points to undisputed evidence that Henderson attended part (but not all) of the meeting where Wills signed admission paperwork. This, Sharmar argues, combined with Wills's testimony that she understood her authority to extend to making "medical decisions" like "going into a rehab facility" and executing "whatever documentation was necessary" to place Henderson "into a facility or

get her any sort of care," shows that Wills acted with implied authority when signing the agreement. *See Fresquez*, ¶¶ 18-19 (explaining that a principal's express manifestation of assent and the agent's reasonable understanding of this assent at the time of the manifestation demonstrates actual authority).

¶ 42    But these arguments do nothing more than rehash the argument that the MDPOA conferred authority on Wills to sign the arbitration agreement. By law, the arbitration agreement was not "documentation [that] was necessary" for Henderson's admission to a health care facility.

¶ 43    Despite the depositions taken, Sharmar did not in the district court and does not on appeal proffer any evidence that there were discussions between Henderson and Wills regarding an arbitration agreement, much less proffer any admissible evidence that Henderson orally authorized Wills to enter into an arbitration agreement. Therefore, we uphold the district court's decision that Wills lacked implied authority to execute the arbitration agreement.

## B.    Apparent Authority

¶ 44    Sharmar next asserts that Wills had apparent authority to agree to arbitration because Henderson's decision to leave Wills to

finish signing admissions paperwork gave rise to Sharmar's reasonable belief that Henderson authorized Wills to execute paperwork on her behalf. For the same reasons that we rejected the claim of actual authority, we reject this contention.

¶ 45 We agree with the district court that there was no proof or reasonable interpretation "of Henderson's written or spoken words or other conduct" that could have caused Sharmar to reasonably believe that Henderson consented to Wills's signing the arbitration agreement on her behalf. *See Fresquez*, ¶ 25 (explaining apparent authority "flows only from the acts and conduct of the principal" that, when reasonably interpreted, cause a third party to believe the principal consented to an act done by the agent on his behalf (citation omitted)). As the district court observed, Henderson's actions and Wills's testimony only show that Henderson authorized Wills to sign paperwork *necessary* for her admittance to Sharmar — not *unnecessary* arbitration agreements. *See id.* at ¶¶ 50-58 (noting general authority to sign admission paperwork and a lack of evidence showing authority to sign an arbitration agreement did not constitute apparent authority).

## C. Evidentiary Hearing

¶ 46 Sharmar relatedly contends that, regardless of the district court's rulings on actual or apparent authority, an evidentiary hearing was required (1) because the district court relied on cases involving arbitration agreements executed as part of a nursing home's admission paperwork and (2) because the act of Henderson leaving Wills to sign admissions paperwork could have supported a different interpretation of Wills's authority.

¶ 47 As noted above, despite the discovery authorized by the district court, at no time prior to the entry of the district court's order denying arbitration did Sharmar proffer any evidence that would support a finding of either express or implied authority. The appellate record is devoid of any such proffer. Because Sharmar had the burden to establish that Wills had authority to execute the arbitration agreement and failed to do so, the district had no obligation to hold an evidentiary hearing.

## V. Estoppel

¶ 48 Lastly, Sharmar insists the district court erred when it did not address whether Reno was estopped from denying the validity of the arbitration agreement. This argument was first raised in Sharmar's

22

reply brief in the district court. The district court was under no obligation to address an argument made for the first time in a reply brief. *See Grohn v. Sisters of Charity Health Servs. Colo.*, 960 P.2d 722, 727 (Colo. App. 1998). Because the opposing party was unable to respond and the district court made no findings or conclusions with respect to the contention, the argument was not preserved for appeal and we do not address it further. *See id.*

## VI. Disposition

¶ 49 The order denying Sharmar's motion to compel arbitration is affirmed.

JUDGE GOMEZ and JUDGE MOULTRIE concur.