**Kathryn LUJAN, individually, and the Estate of Estella O. Lujan, through Kathryn Lujan as putative representative, Plaintiffs–Appellees and Cross–Appellants,**

v.

**LIFE CARE CENTERS OF AMERICA, a Tennessee corporation, d/b/a Evergreen Nursing Home, Defendant–Appellant and Cross–Appellee.**

No. 08CA2367.

Colorado Court of Appeals,
Div. V.

Nov. 25, 2009.

Law Office of John Robert Holland, P.C., John Robert Holland, Anna Holland–Edwards, Erica Tick Grossman, Denver, Colorado; Law Firm of Portales & Associates, P.C., R.E. Chips Portales, Joseph Oliva, Denver, Colorado, for Plaintiffs–Appellees and Cross–Appellants.

Kennedy Childs & Fogg, P.C., Barbara Glogiewicz, Ronald Nemirow, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge GABRIEL.

Life Care Centers of America (Life Care) appeals the district court's order denying its motion to compel arbitration. As a matter of first impression in Colorado, we hold that a health care proxy decision-maker (health care proxy) does not have authority to enter into arbitration agreements for incapacitated patients. Accordingly, we affirm.

## I. Background

Estella O. Lujan (Mrs. Lujan) was first admitted to a Life Care facility, Evergreen Nursing Home, on November 8, 2005. Ten days later, her physician signed a "Physician's Statement to Initiate Health Care Proxy," which stated that Mrs. Lujan lacked decision-making capacity due to dementia

and that the physician would contact family members and other interested persons to advise them of their option to designate a health care proxy.

Thereafter, Mrs. Lujan left Evergreen Nursing Home for a period of time. She was readmitted, however, on October 18, 2006. At that time, her son, Alvin Lujan, purporting to act as Mrs. Lujan's "legal representative," completed the admissions paper work, which included an agreement to arbitrate disputes arising out of or in any way related or connected to Mrs. Lujan's stay and care provided at the facility. Alvin Lujan did not hold any form of power of attorney for Mrs. Lujan, nor was he appointed by any court to act as a conservator or guardian for her.

Mrs. Lujan died on October 21, 2006.

Subsequently, Kathryn Lujan, who is Mrs. Lujan's daughter, and Mrs. Lujan's estate (collectively, plaintiffs) filed a complaint against Life Care, asserting claims for (1) wrongful death, including felonious killing; (2) violations of the Colorado Consumer Protection Act, §§ 6–1–101 to –1120, C.R.S.2009; (3) outrageous conduct; and (4) declaratory relief, seeking a declaration that this action is not subject to arbitration because there was no valid arbitration agreement.

Life Care moved to stay the proceedings and compel arbitration of plaintiffs' claims. Plaintiffs opposed the motion and requested an evidentiary hearing. In a detailed written order, the district court denied Life Care's motion and deemed plaintiffs' request for an evidentiary hearing moot.

Life Care now appeals, and plaintiffs conditionally cross-appeal.

## II.  Standard of Review

■ An order denying a motion to compel arbitration is immediately appealable. § 13–22–228(1)(a), C.R.S.2009. We review de novo the district court's decision on a motion to compel arbitration, employing the same legal standards that the district court employed. *Moffett v. Life Care Centers*, 187 P.3d 1140, 1143 (Colo.App.2008) (*Moffett I*), *aff'd*, 219 P.3d 1068 (Colo.2009) (*Moffett II*).

■ In considering a motion to compel arbitration, the district court must first determine whether a valid agreement to arbitrate exists between the parties to the action. *Id.* The court may properly refuse to compel arbitration only when there is no valid agreement to arbitrate or when the issue sought to be arbitrated is clearly beyond the scope of the arbitration provision. *Id.* Whether a valid agreement to arbitrate exists is a matter of law that we review de novo. *Id.*

## III.  Alvin Lujan's Authority to Execute the Arbitration Agreement

Sections 15–18.5–103 and 15–18.5–104, C.R.S.2009, provide for the selection of a health care proxy to make medical treatment decisions and health care benefit decisions on behalf of an incapacitated patient. Specifically, these provisions allow a health care proxy to act on behalf of another when

> an adult patient's attending physician determines that such patient lacks the decisional capacity to provide informed consent to or refusal of medical treatment and no guardian with medical decision-making authority, agent appointed in a medical durable power of attorney, person designated as a designated beneficiary with the right to act as a proxy decision-maker ..., or other known person has the legal authority to provide such consent or refusal on the patient's behalf.

§ 15–18.5–103(1), C.R.S.2009.

Section 15–18.5–103 sets forth the procedure for the selection of a health care proxy. That section provides, in substance, that upon determining that an adult patient lacks decisional capacity to provide informed consent to or refuse medical treatment, the treatment provider must make reasonable efforts to notify the patient of the patient's lack of decisional capacity and to locate as many "interested persons" as practicable. § 15–18.5–103(3), C.R.S.2009. "Interested persons" include the patient's spouse, parents, adult children, siblings, grandchildren, and close friends. *Id.* The treatment provider must inform the interested persons that the patient lacks decisional capacity and that a health care proxy should be selected for the patient. *Id.* The interested persons must

then make reasonable efforts to reach a consensus as to who among them shall make medical treatment decisions on behalf of the patient. § 15–18.5–103(4)(a), C.R.S.2009. The person selected to act as the patient's health care proxy should be the person who has a close relationship with the patient and who is most likely to be currently informed of the patient's wishes regarding medical treatment decisions. *Id.* If any of the interested persons disagrees with the selection or the decision of the health care proxy, or if, after reasonable efforts, the interested persons are unable to reach a consensus as to who should act as the proxy, then any of them may seek guardianship in appropriate judicial proceedings. *Id.*

■ As the foregoing provisions make clear, a health care proxy is distinct from an attorney-in-fact under a power of attorney. "A power of attorney is an instrument by which a principal confers express authority on an agent to perform certain acts or kinds of acts on the principal's behalf." *In re Trust of Franzen,* 955 P.2d 1018, 1021 (Colo. 1998). Thus, the execution of a power of attorney creates a principal-agent relationship. *Moffett II,* 219 P.3d at 1074.

In contrast, a health care proxy is not selected by the patient. Nor does the patient have any role in determining what authority the health care proxy may exercise on his or her behalf. Rather, the proxy's authority is established and governed by statute. *See* §§ 15–18.5–103 & –104. Specifically, a properly selected health care proxy is authorized to make "medical treatment" decisions under § 15–18.5–103 and "health care benefit decisions" under § 15–18.5–104 on behalf of the incapacitated patient. *Id.*

■ The principal question before us is whether Alvin Lujan, purportedly acting as a health care proxy, had the authority to enter into an arbitration agreement on behalf of Mrs. Lujan. The district court concluded that an agreement to arbitrate is not a "health care benefit decision," and Life Care does not assert on appeal that this determination was error. Accordingly, the issue that we must decide is whether a decision to agree to arbitrate is a "medical treatment

decision." We conclude as a matter of first impression in Colorado that it is not.

We review de novo issues of law involving statutory interpretation. *Moffett I,* 187 P.3d at 1143. Our primary goal in statutory interpretation is to find and give effect to legislative intent. *Id.* We first look to the language of the statute, giving words and phrases their plain and ordinary meanings. *Id.* When a court construes a statute, it should read and consider the statute as a whole and interpret it in a manner giving consistent, harmonious, and sensible effect to all its parts. *Id.* In doing so, a court should not interpret the statute so as to render any part of it either meaningless or absurd. *Id.* at 1144.

■ If the statute is unambiguous, we look no further. *Id.* If a statute is ambiguous, however, then we may consider prior law, legislative history, the consequences of a given construction, and the underlying purpose or policy of the statute. *Id.*

Pursuant to section 15–18.5–102, C.R.S. 2009, "medical treatment decision" is defined by reference to the definition set forth in section 15–14–505(7), C.R.S.2009, which applies to medical durable powers of attorney. That section defines "medical treatment" as

the provision, withholding, or withdrawal of any health care, medical procedure, including artificially provided nourishment and hydration, surgery, cardiopulmonary resuscitation, or service to maintain, diagnose, treat, or provide for a patient's physical or mental health or personal care.

Construing the plain and unambiguous language of this statutory definition, we conclude that an agreement to arbitrate is not a "medical treatment" decision.

As an initial matter, we fail to perceive how an agreement to arbitrate is a decision concerning "the provision, withholding, or withdrawal of any health care, medical procedure, ... or service to maintain, diagnose, treat, or provide for a patient's physical or mental health or personal care." Although we agree with Life Care that a decision to admit an incapacitated patient to a hospital or nursing home appears to fall within this definition, this does not mean that a decision to execute an arbitration agreement likewise

falls within this definition, even if the arbitration agreement is included in the admissions agreement. This is particularly true here, where, as a matter of law, a health care provider may not condition the provision of medical care services on the patient's signing an arbitration agreement. § 13–64–403(7), C.R.S.2009. In our view, this prohibition reveals a clear legislative intent to distinguish between an agreement to provide medical services (including an agreement to admit a patient to a health care facility) and an agreement to arbitrate a health care dispute.

Our conclusion in this regard finds further support in the legislative declaration preceding the health care proxy provisions at issue. See § 15–18.5–101, C.R.S.2009. To the extent this legislative declaration refers to "medical treatment," it speaks in terms of specific medical procedures (e.g., artificial nourishment and hydration) or forms of healing (e.g., religious and spiritual healing). See § 15–18.5–101(1)(a), (2), C.R.S.2009. Moreover, we note the General Assembly's several references to "informed consent," § 15–18.5–101(1)(b)–(c), C.R.S.2009, which is defined as "[a] patient's knowing choice about a medical treatment or procedure, made after a physician or other healthcare provider discloses whatever information a reasonably prudent provider in the medical community would give to a patient regarding the risks involved in the proposed treatment or procedure." Black's Law Dictionary 323 (8th ed.2004).

These references reinforce our view that "medical treatment" in the context of a health care proxy is to be narrowly construed and does not include the authority to sign an arbitration agreement on behalf of an incapacitated patient.

Although no Colorado appellate court appears to have addressed the question of whether a health care proxy's decision to agree to arbitrate is a medical treatment decision, courts in other jurisdictions, construing statutory provisions similar to those at issue here, have held that it is not.

For example, in *Pagarigan v. Libby Care Center, Inc.*, 99 Cal.App.4th 298, 120 Cal. Rptr.2d 892 (2002), a comatose patient's children signed two arbitration agreements shortly after the patient was admitted to a nursing facility. After the patient's death, the children sued the nursing facility, which moved to compel arbitration of the children's claims. *Id.* at 893. The facility argued that under section 1418.8 of California's Health and Safety Code, next of kin are authorized to make medical treatment decisions for an incapacitated patient at the request of the treating physician. *Pagarigan*, 120 Cal. Rptr.2d at 895. The facility thus asserted that the next of kin had the authority to bind the patient to arbitration. *Id.*

The California Court of Appeal disagreed, noting that the facility failed to explain how the authority to make medical treatment decisions translated into the authority to sign an arbitration agreement on the patient's behalf. *Id.* The court observed that the legislature and the department of health services knew how to confer authority on next of kin to act on behalf of a nursing home resident when they wanted to do so. *Id.* Perceiving no authority to enter into arbitration agreements in the statute at issue, the court concluded that the patient's children lacked authority to sign such an agreement. *Id.*

Similarly, in *Flores v. Evergreen at San Diego, LLC*, 148 Cal.App.4th 581, 55 Cal. Rptr.3d 823 (2007), the husband of a patient with dementia signed various nursing facility admissions documents, including two arbitration agreements. *Id.* at 825. Subsequently, the patient and her husband sued the nursing facility, which then moved to compel arbitration. *Id.* at 826. The California Court of Appeal, applying *Pagarigan*, held that the husband lacked the authority to sign an arbitration agreement on the patient's behalf. *Id.* at 832. The court reasoned:

> [A]s a matter of practical necessity there are certain decisions that must be made for a mentally incompetent nursing home patient even when there is no formal representative. The Legislature recognized this reality when it specified next of kin as among the persons authorized to make medical decisions.... It is likely the Legislature also intended to allow next of kin to sign a nursing home contract for the limited purpose of *admitting* a mentally incompetent relative to the facility, even if the family member did not technically

qualify as an agent, legal representative or responsible party.

*Id.* at 831–32 (emphasis in original).

The court then distinguished the decision to sign an arbitration agreement from those decisions that next of kin are authorized to make:

Unlike admission decisions and medical care decisions, the decision whether to agree to an arbitration provision in a nursing home contract is not a necessary decision that must be made to preserve a person's well-being.

*Id.* at 832.

*Blankfeld v. Richmond Health Care, Inc.,* 902 So.2d 296 (Fla.Dist.Ct.App.2005), is also instructive. In *Blankfeld,* a senile nursing home patient's son signed an admission agreement that included an arbitration provision. *Id.* at 297. The trial court entered an order compelling arbitration, and the son appealed. *Id.* The appellate court reversed, concluding that the son had no authority to agree to the arbitration provision. *Id.* at 301.

The *Blankfeld* court began its analysis by noting that the son's authority was, at best, as a health care proxy under Fla. Stat. § 765.401 (2001). *Blankfeld,* 902 So.2d at 299. Like the Colorado statutes discussed above, the applicable Florida statute provided that if an incapacitated patient had not executed an advance directive, health care decisions could be made by a designated list of individuals. Health care decisions were defined to include "[i]nformed consent, refusal of consent, or withdrawal of consent to any and all health care, including life-prolonging procedures." *Id.* at 300 (quoting Fla. Stat. § 765.101(5)(a)).

Similar to the question now before us, the issue for the *Blankfeld* court was whether waiving the right to sue for damages in court was a health care decision. The court held that it was not:

The statutory context demonstrates why a health care proxy was never intended to make such a decision. Under the statutory scheme, because of the loss of mental faculties, the patient is not able to choose or select the proxy for herself. The proxy is called upon to act only because the patient is "incapacitated or developmentally disabled" and cannot do so for herself. Also, the proxy is needed because there is no guardian or health care surrogate for the patient. And so the proxy is a last and limited resort whose purpose is simply to consent to health care services that the patient herself would likely choose if able to do so.

*Id.* (citations omitted).

Applying this reasoning, the court concluded that a proxy is not authorized to waive the right to trial by jury, to waive common law remedies, or to agree to modify statutory duties applicable generally to all persons receiving health care services. *Id.* at 301.

Finally, in *Mississippi Care Center of Greenville, LLC v. Hinyub,* 975 So.2d 211 (Miss.2008), a nursing home patient's daughter signed an admissions agreement containing an arbitration provision. *Id.* at 213. One question before the Mississippi Supreme Court was whether the daughter had authority to sign the arbitration agreement as a health care surrogate under Miss.Code Ann. § 41–41–211 (rev.2005). *Hinyub,* 975 So.2d at 217. The court held that she did not. *Id.* at 218.

In Mississippi, a patient may designate a surrogate, or, absent such a designation, certain designated family members may serve as surrogates. *Id.* at 217 (citing Miss.Code Ann. § 41–41–211(2)). A surrogate in Mississippi has similar authority to a health care proxy in Colorado:

A surrogate may make a health-care decision for a patient who is an adult . . . if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or the agent or guardian is not reasonably available.

*Id.* at 217 (quoting Miss.Code Ann. § 41–41–211(1)).

"Health-care decision" means a decision made by an individual or the individual's agent, guardian, or surrogate, regarding the individual's health care . . . .

*Id.* at 218 (quoting Miss.Code Ann. § 41–41–203(h)). "Health care," in turn, is defined as

"any care, treatment, service, or procedure to maintain, diagnose, or otherwise affect an individual's physical or mental condition." Miss.Code Ann. § 41–41–203(g) (rev.2005).

The *Hinyub* court held that, because the arbitration provision before it was not part of the consideration necessary for the patient's admission and was not necessarily in his best interests, the health care surrogate lacked authority to agree to arbitration. 975 So.2d at 218. In so holding, the court distinguished prior cases in which it had concluded that the execution of an arbitration provision in the admissions agreement was a "health care decision." *Id.* In those cases, the arbitration provision was an essential part of the consideration for the health care. *Id.* (discussing, among other cases, *Covenant Health Rehab of Picayune, L.P. v. Brown,* 949 So.2d 732, 736–37 (Miss.2007), *overruled on other grounds by Covenant Health & Rehabilitation of Picayune, L.P. v. Estate of Moulds ex rel. Braddock,* 14 So.3d 695, 706 (Miss.2009)). In *Hinyub,* on the other hand, it was not, because the daughter was not required to sign the arbitration provision for her father to be admitted to the nursing home. *Id.*

For several reasons, we are persuaded by the reasoning of these various out-of-state cases and conclude that the same analysis should apply here.

First, as in *Pagarigan,* when the Colorado General Assembly wishes to confer authority to arbitrate, it knows how to do so. For example, section 15–14–726(1)(d), C.R.S.2009, provides, among other things, that unless otherwise limited, an agent under a general power of attorney has the authority to "initiate, participate in, [or] submit to alternative dispute resolution," which includes arbitration under section 13–22–313(1), C.R.S.2009.

Second, as in *Flores* and *Hinyub,* we perceive a distinction between decisions that are truly necessary to preserve a patient's health and well-being and a decision to execute an arbitration agreement, which is not integral to a patient's health and well-being and which no Colorado health care provider may require as a condition to the provision of medical services. § 13–64–403(7).

Finally, like the patient in *Blankfeld,* Mrs. Lujan was not able to select her health care proxy or make a determination as to the authority that she would give the proxy. For the reasons set forth in *Blankfeld,* we conclude that because of this lack of choice, the health care proxy's authority should be viewed as a last resort and should be strictly limited to those decisions that are necessary to preserve a patient's health and well-being and that the patient would likely make were he or she able to do so.

Section 13–64–403(1), C.R.S.2009, which requires arbitration agreements to be voluntary agreements between patients and health care providers, fully supports our conclusion. Specifically, because the patient had no say in either appointing the proxy or determining the limits of the proxy's authority, by definition, no arbitration agreement entered into by the proxy could be construed as the voluntary decision of the patient.

As Life Care notes, courts in certain other jurisdictions have concluded (or at least suggested in dicta) that health care proxies or surrogates may sign arbitration agreements on behalf of incapacitated patients. *See, e.g., Brown,* 949 So.2d at 737; *Barbee v. Kindred Healthcare Operating, Inc.,* 2008 WL 4615858, at * 11 (Tenn.Ct.App. No. W2007–00517–COA–R3–CV, Oct. 20, 2008) (unpublished opinion); *In re Ledet,* 2004 WL 2945699, at *4 & n. 5 (Tex.App. No. 04–04–00411–CV, Dec. 22, 2004) (unpublished memorandum opinion). These cases, however, are distinguishable.

For example, *Brown* is distinguishable because, there, signing the arbitration agreement was an essential part of the consideration for the agreement to provide medical services, and, unlike here, there was no prohibition on conditioning such services on the execution of an arbitration agreement. *Brown,* 949 So.2d at 737.

*Ledet* is distinguishable because, in that case, the party opposing arbitration did not brief "in any manner" whether a surrogate decision-maker's authority included the authority to sign an arbitration agreement on behalf of an incapacitated patient. *Ledet,* 2004 WL 2945699, at *4 & n. 5. In addition, the court noted that there was evidence that all of the surrogate's siblings agreed to allow

him to sign the arbitration agreement and that he had actual authority. *Id.*

Finally, *Barbee* is distinguishable because the court there undertook no analysis at all in determining that execution of admission documents, including an arbitration agreement, is a health care decision. *See Barbee,* 2008 WL 4615858, at *11. Instead, the court cited to case law concerning authority under medical durable powers of attorney, *id.,* which, as we discuss below, is distinguishable.

Notwithstanding the foregoing, Life Care asserts that the district court erred in denying its motion to compel arbitration because (1) under *Moffett I,* 187 P.3d at 1147, a health care proxy's decision to enter into an arbitration agreement is a medical treatment decision; (2) Colorado's public policy favoring arbitration requires us to conclude that a health care proxy can enter into an arbitration agreement on behalf of a patient; and (3) a health care proxy can make life and death decisions and thus should also be permitted to make the less significant decision to agree to arbitrate disputes. For several reasons, we are not persuaded.

First, although we recognize that *Moffett I* and certain other cases concerning durable medical powers of attorney can be read to suggest that medical treatment decisions include the right to agree to arbitration, those cases turned on the nature of the medical durable powers of attorney at issue and the authority that the patient granted to the attorney-in-fact. *See Moffett I,* 187 P.3d at 1144–47; *Owens v. National Health Corp.,* 263 S.W.3d 876, 884–85 (Tenn.2007). Specifically, these cases began with the premise that the medical durable powers of attorney at issue, *when read in conjunction with common law agency principles or applicable statutory powers of attorney,* provided very broad powers concerning decisions relating to health care. *See Moffett I,* 187 P.3d at 1144–45; *Owens,* 263 S.W.3d at 884–85; *see also Moffett II,* 219 P.3d at 1071 (without reaching the question of whether a person holding a medical durable power of attorney may properly enter into an arbitration agreement on behalf of a person who becomes incapacitated after the power of attorney is signed, holding that an agent-in-fact under a general power of attorney may do so). From that premise, these courts determined that the medical durable powers of attorney at issue included the authority to sign arbitration agreements, absent any limitations or restrictions on that authority imposed by the principal. *See Moffett I,* 187 P.3d at 1145; *Owens,* 263 S.W.3d at 884.

We view these cases as distinguishable because, as noted above, a health care proxy is distinct from an attorney-in-fact acting under a power of attorney. Specifically, in the case of a health care proxy, the patient did not select the proxy, nor did the patient have any say in the powers to be granted to the proxy. Thus, in our view, the statutory authority afforded a health care proxy should be construed narrowly, unlike the broad powers presumed to be afforded under a medical durable power of attorney. *See* Susan Fox Buchanan, *The Colorado Patient Autonomy Act: Opportunities and Challenges—Part II,* 21 Colo. Law. 2203, 2206 (1992) ("Whereas an agent's powers pursuant to a medical durable power of attorney are unbridled (except by the standards of acceptable medical practice and law), a proxy's authority is somewhat narrower."); *see also Hogan v. Country Villa Health Services,* 148 Cal.App.4th 259, 55 Cal. Rptr.3d 450, 456 (2007) (concluding that a medical durable power of attorney authorized the patient's daughter to sign an arbitration agreement, and noting that the absence of such a power of attorney in health care proxy cases in which courts refused to compel arbitration was a "critical" distinction).

Second, although we acknowledge Colorado's strong public policy in favor of arbitration, *see J.A. Walker Co. v. Cambria Corp.,* 159 P.3d 126, 128 (Colo.2007), we are aware of no authority under which this policy has been applied to trump applicable statutory language or to create a right to arbitrate that does not exist in a statute. Nor does Life Care cite any such authority. To the contrary, it appears well settled that any presumption in favor of arbitration disappears when the parties dispute the existence of a valid arbitration agreement. *Dumais v. American Golf Corp.,* 299 F.3d 1216, 1220 (10th Cir.2002); *see also Miner v. Walden,*

101 Misc.2d 814, 422 N.Y.S.2d 335, 337 (N.Y.Sup.Ct.1979) (noting that the policy favoring arbitration cannot displace the need for proof of a voluntary agreement to arbitrate).

Finally, although a health care proxy can make major life and death decisions, such authority does not necessarily imply the authority to agree to arbitrate. For the reasons set forth above, the power to make life and death decisions is clearly within the statutory authority provided to a health care proxy. §§ 15–14–505(7), 15–18.5–103(1). The decision to enter into an arbitration agreement is not.

For these reasons, we conclude that Alvin Lujan, in his purported capacity as health care proxy, was not authorized to sign an arbitration provision on behalf of his incapacitated mother. Accordingly, we conclude that the district court correctly denied Life Care's motion to compel arbitration.

## IV. Plaintiffs' Conditional Cross–Appeal

In light of our foregoing determination, we need not address the issues raised by plaintiffs' conditional cross-appeal as to the need for an evidentiary hearing.

## V. Conclusion

The order is affirmed.

Judge GRAHAM and Judge CONNELLY concur.