The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
January 28, 2021

**2021COA7**

**No. 19CA1211, *Johnson v Rowan Inc* — Health and Welfare —**

**Health Care Availability Act — Agreement for Medical Services;**

**ADR — Arbitration**

A division of the court of appeals considers for the first time

whether a health care provider substantially complies with

section 13-64-403, C.R.S. 2020, of the Health Care Availability Act

if it (1) fails to provide a patient with a written copy of an arbitration

agreement that the patient has signed or (2) itself fails to sign the

arbitration agreement. Applying the supreme court's analysis in

*Colorow Health Care LLC v. Fischer*, 2018 CO 52M, 420 P.3d 259,

the division concludes that a health care provider that either does

not provide the written copy of the arbitration agreement to the

patient or does not sign it fails to substantially comply with the Act

and, as a consequence, its arbitration agreement is unenforceable against the patient.

COLORADO COURT OF APPEALS                                    **2021COA7**

Court of Appeals No. 19CA1211
City and County of Denver District Court No. 18CV33463
Honorable Ross B. Buchanan, Judge

Patricia Johnson, individually and as heir at law of Christal Johnson,
deceased; and Randall Johnson, individually and as heir at law of Christal
Johnson, deceased,

Plaintiffs-Appellees,

v.

Rowan Incorporated, a Colorado corporation; Jay Moskowitz; and QP Health
Care Services LLC,

Defendants-Appellants.

ORDER AFFIRMED

Division VI
Opinion by JUDGE LIPINSKY
Pawar and Martinez*, JJ., concur

Announced January 28, 2021

Law Offices of J.M. Reinan, P.C., Jerome M. Reinan, Jordana Griff Gingrass,
Denver, Colorado, for Plaintiffs-Appellees

Messner Reeves LLP, Kendra N. Beckwith, Doug C. Wolanske, Mary Byrne
Fletcher, Elizabeth K. Slinas-Van Orman, Denver, Colorado, for Defendants-
Appellants

Levin Sitcoff, PC, Nelson Waneka, Dener, Colorado, for Amicus Curiae Colorado
Trial Lawyers Association

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1    Randall and Patricia Johnson were handed a stack of forms when they admitted their seriously ill adult daughter, Christal, to Rowan Community, a long-term care facility.  The Johnsons signed a number of those documents that day at the request of Rowan Community's social services director.  One of those documents was an arbitration agreement (the agreement).

¶ 2    Following Christal's death less than two months later, the Johnsons, individually and as Christal's heirs, sued Rowan Community's owner — Rowan Incorporated — and two other defendants — Jay Moskowitz and QP Health Care Services LLC (collectively, Rowan) for wrongful death, among other causes of action.  Rowan moved to compel arbitration based on the language of the agreement.  The Johnsons argued that the agreement was unenforceable for two reasons — because a Rowan Community representative had not countersigned it and because Rowan Community had allegedly not provided them with a written copy of the agreement, in violation of provisions of the Health Care Availability Act (the Act), §§ 13-64-101 to -503, C.R.S. 2020.  In a written order, the district court agreed with the Johnsons and held

that the agreement was unenforceable.  Rowan filed this interlocutory appeal.

¶ 3     We decide that, under the Act, Rowan Community cannot enforce the agreement because it did not substantially comply with the Act's requirements that a health care provider (1) give the patient a written copy of any arbitration agreement he or she signs and (2) itself sign the arbitration agreement.  For these reasons, we affirm the district court's order.

## I.     Background

¶ 4     Christal Johnson had a brain tumor and other serious health conditions.  The Johnsons decided to place Christal in a long-term care facility when they were no longer able to care for her on their own.  The Johnsons selected Rowan Community, a skilled nursing facility, to provide their daughter with round-the-clock care.

¶ 5     On the day of Christal's arrival at Rowan Community, the Johnsons met with Rowan Community's social services director, Tammy Gleisner, to complete the admission process.  Gleisner presented the Johnsons with what Mr. Johnson described as an "inch-and-a-half worth of papers" for them to sign as Christal's legal representatives.  Either or both of the Johnsons signed the

documents, including the agreement, during their meeting with Gleisner. Neither Gleisner nor any other representative of Rowan Community signed the agreement, however. In addition, the district court found that Gleisner did not provide the Johnsons with a written copy of the agreement.

¶ 6 Christal was hospitalized three times shortly after her admission to Rowan Community. She died during the third hospitalization.

¶ 7 The Johnsons filed suit against Rowan Community's corporate owner, its management company, and those companies' individual owner, manager, and operator for negligence resulting in wrongful death, violation of the Colorado Consumer Protection Act, fraud and fraudulent nondisclosure, and civil conspiracy.

¶ 8 Rowan's attorneys informed counsel for the Johnsons that the Johnsons had signed the agreement at the time Christal was admitted to Rowan Community and provided a written copy of the agreement to the Johnsons' counsel. The copy of the agreement provided to the Johnsons contained Mr. Johnson's signature, but was missing the signature of a representative of Rowan Community. The Johnsons asserted that they had not seen the agreement

3

before. Through their counsel, the Johnsons attempted to exercise their right to rescind the agreement pursuant to the agreement's rescission clause. Rowan responded that the Johnsons had waited too long to rescind the agreement and were therefore bound by its terms.

¶ 9 Rowan moved to stay the Johnsons' case and compel arbitration based on the terms of the agreement.

¶ 10 The district court conducted an evidentiary hearing at which Mr. Johnson and Gleisner testified. Mr. Johnson testified that he did not recall discussing the agreement with Gleisner, signing it, or receiving a written copy of it, and that he had not intended to waive his and his wife's right to a jury trial. Gleisner testified that she discussed the agreement with the Johnsons and that her failure to sign the agreement was "an oversight."

¶ 11 Following the hearing, the district court entered an order denying Rowan's motion. After finding that Mr. Johnson was more credible than Gleisner, the court further found that Rowan Community had not provided the Johnsons with a written copy of the agreement. After considering the supreme court's analysis of the Act in *Colorow Health Care, LLC v. Fischer*, 2018 CO 52M, 420

4

P.3d 259, the court concluded that, because Rowan Community failed to sign the agreement and provide a written copy of the agreement to the Johnsons, "the Agreement does not substantially comply with [the] statutory requirements of C.R.S. § 13-64-403, [C.R.S. 2020] and thus, . . . is invalid."

¶ 12     The district court distinguished the requirements of the Act that the health care provider sign and provide a written copy of the arbitration agreement to the patient from the requirement of the Act at issue in *Colorow* — that health care arbitration agreements contain, in bold-faced text, a statement disclosing to the patient that, by signing the agreement, she is waiving the right to have any issue of medical malpractice decided by a jury or court trial. (The parties do not dispute that the Act's references to "patient" include authorized patient representatives, such as Mr. Johnson, who sign a health care arbitration agreement on behalf of the patient. For this reason, in this opinion we do not distinguish between patients and the authorized patient representatives who sign arbitration agreements on behalf of the patients.)

¶ 13     The district court held that, in contrast to the health care provider's minimal noncompliance with the Act's typeface

5

requirement at issue in *Colorow*, Rowan Community had failed to substantially comply with the Act by neither signing the agreement nor providing a written copy of the agreement to the Johnsons. Applying the substantial compliance standard, the district court held that Rowan Community's failure to comply with the Act adversely affected the Johnsons' ability to exercise their statutory right to rescind the agreement and thus rendered the agreement unenforceable.

¶ 14    Rowan filed this interlocutory appeal pursuant to section 13-22-228(1)(a), C.R.S. 2020.

## II.    Discussion

¶ 15    Rowan challenges only the district court's legal conclusion and not its factual findings. Thus, we accept the district court's findings of fact and limit our review to the legal issue of whether the agreement complied with the Act and, therefore, is enforceable against the Johnsons.

### A.    Jurisdiction and Standard of Review

¶ 16    "An order denying a motion to compel arbitration is immediately appealable." *Lujan v. Life Care Ctrs. of Am.*, 222 P.3d 970, 972 (Colo. App. 2009); *see* § 13-22-228(1)(a). We review issues

of statutory construction de novo. *Colorow*, ¶ 10, 420 P.3d at 261-62. Specifically, "[w]e review de novo the district court's decision on a motion to compel arbitration, employing the same legal standards that the district court employed." *Lujan*, 222 P.3d at 972 (citing *Moffett v. Life Care Ctrs. of Am.*, 187 P.3d 1140, 1143 (Colo. App. 2008)).

B. *Colorow* and the Substantial Compliance Standard for Arbitration Agreements Under the Act

¶ 17     "Arbitration is favored in Colorado as a convenient and efficient alternative to resolving disputes by litigation. A valid and enforceable arbitration provision divests the court of jurisdiction over all arbitrable issues." *Vallagio at Inverness Residential Condo. Ass'n v. Metro. Homes, Inc.*, 2015 COA 65, ¶ 13, 412 P.3d 709, 713 (citation omitted), *aff'd*, 2017 CO 69, 395 P.3d 788. A court "may refuse to compel arbitration 'only upon a showing that there is no agreement to arbitrate or if the issue sought to be arbitrated is clearly beyond the scope of the arbitration provision.'" *Id.* at ¶ 14, 412 P.3d at 713 (quoting *Eychner v. Van Vleet*, 870 P.2d 486, 489 (Colo. App. 1993)).

¶ 18    Section 13-64-403 of the Act sets forth the requirements for arbitration agreements between health care providers and their patients.  The Act addresses two principal policy objectives concerning such arbitration agreements.  First, the Act generally "assure[s] the continued availability of adequate health care services . . . by containing the significantly increasing costs of malpractice insurance for medical care institutions." § 13-64-102(1), C.R.S. 2020.  Second, while authorizing agreements to arbitrate health care disputes to accomplish this general purpose, section 13-64-403 also requires that such agreements be voluntary and "contain[] protective provisions [to] curb[] abusive practices in obtaining agreements to arbitrate."  *Moffett v. Life Care Ctrs. of Am.*, 219 P.3d 1068, 1073 (Colo. 2009); *see* § 13-64-403(1).

¶ 19    To ensure that a patient enters into a health care arbitration agreement voluntarily, section 13-64-403 sets forth several requirements for arbitration agreements between health care providers and their patients.  Three of these requirements are germane to the resolution of this appeal.

¶ 20    First, a health care arbitration agreement

shall have the following statement set forth as part of the agreement: ". . . The patient has the right to seek legal counsel concerning this agreement, and has the right to rescind this agreement by written notice to the physician within ninety days after the agreement has been signed and executed by both parties unless said agreement was signed in contemplation of the patient being hospitalized, in which case the agreement may be rescinded by written notice to the physician within ninety days after release or discharge from the hospital or other health care institution. . . ."

§ 13-64-403(3). (The district court found that the agreement was not signed in contemplation of Christal being hospitalized. As noted above, Rowan does not challenge the court's findings of fact.)

¶ 21 Second, the required disclosure statement must be printed in "at least ten-point bold-faced type" immediately above the agreement's signature lines. The statement must read, in relevant part:

**NOTE: BY SIGNING THIS AGREEMENT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL BINDING ARBITRATION RATHER THAN BY A JURY OR COURT TRIAL.**

**YOU HAVE THE RIGHT TO SEEK LEGAL COUNSEL AND YOU HAVE THE RIGHT TO RESCIND THIS AGREEMENT WITHIN NINETY DAYS FROM THE DATE OF**

**SIGNATURE BY BOTH PARTIES UNLESS THE AGREEMENT WAS SIGNED IN CONTEMPLATION OF HOSPITALIZATION IN WHICH CASE YOU HAVE NINETY DAYS AFTER DISCHARGE OR RELEASE FROM THE HOSPITAL TO RESCIND THE AGREEMENT**.

§ 13-64-403(4).

¶ 22 Third, "[t]he patient shall be provided with a written copy of any agreement subject to the provisions of this section at the time that it is signed by the parties." § 13-64-403(6).

¶ 23 A health care provider may not condition the provision of medical care services or emergency medical services on a patient's failure or refusal to sign such an agreement or exercise of the statutory ninety-day right of rescission. § 13-64-403(7)-(8).

¶ 24 These provisions grant the patient a period of time to reflect on the implications of waiving the right to have a judge or jury hear any malpractice case against the health care provider. Further, the provisions give the patient the ability to review the arbitration agreement with legal counsel and, if she chooses, to exercise the right of rescission. A provider's failure to comply with these provisions of the Act "render[s] the [arbitration] agreement unenforceable." *Allen v. Pacheco*, 71 P.3d 375, 381 (Colo. 2003).

10

¶ 25    In *Colorow*, in the course of discussing section 13-64-403(4)'s typeface requirement, the Colorado Supreme Court broadly held that health care providers need only substantially comply with the Act.  Although the arbitration agreement at issue in *Colorow* included the required language, the section 13-64-403(4) disclosure statement was printed in regular "twelve-point type and all capital letters," rather than in "bold-faced . . . font."  *Colorow*, ¶¶ 6, 28, 420 P.3d at 261, 264.  The patient's family contended that the variance from the typeface requirement rendered the agreement unenforceable.

¶ 26    The *Colorow* court first decided whether an arbitration agreement must strictly comply, or only substantially comply, with the Act to be enforceable.  After determining that the text of the Act did not shed light on the required level of compliance, the court considered which standard best "effectuates the General Assembly's purpose in enacting the [Act]."  *Id.* at ¶ 27, 420 P.3d at 264.

¶ 27    The court first noted that the purpose of the typeface requirement is to "emphasize the required language.  Emphasizing this text encourages patients to read it and understand its importance."  *Id.* at ¶ 28, 420 P.3d at 264.  Significantly for our

11

analysis, the court said that, "[w]hile bold-faced text and minimum print size are ways to draw attention to the advisement, there are other — sometimes better — ways to do so," such as highlighting the language or placing it in all capital letters. *Id.* at ¶ 29, 420 P.3d at 264. And, as the court pointed out, depending on the particular font used, "strict compliance might nonetheless fail to draw attention to the voluntariness language." *Id.*

¶ 28     Concluding that the General Assembly did not "intend[] to elevate form over function," the court held that the purpose of the typeface requirement — to conspicuously disclose important information to the patient — "is better served by the flexibility substantial compliance affords." *Id.* at ¶ 30, 420 P.3d at 265.

¶ 29     The court then "examine[d] the general purpose animating the [Act] as a whole: keeping insurance costs low for medical providers." *Id.* at ¶ 31, 420 P.3d at 265. It held that this purpose was supported by the application of a substantial, rather than a strict, compliance standard to the typeface requirement, which would "send the right issues to court." *Id.* at ¶ 34, 420 P.3d at 266. Under substantial compliance,

> agreements with only minor technical deficiencies — those that don't bear on voluntariness in any material sense — will keep parties in arbitration and avoid the costs of full-blown merits litigation. A party seeking to litigate the merits will have a colorable substantial-compliance issue to litigate only when an arbitration agreement suffers more serious deficiencies — those that could actually bear on voluntariness.

*Id.* Thus, "[p]unishing health care providers for minor typographical deficiencies that don't affect voluntariness wouldn't serve . . . the Act's purposes." *Id.* at ¶ 35, 420 P.3d at 266. But where "more significant deficiencies . . . might affect voluntariness, punishing providers for failure to substantially comply would further the statute's purpose of ensuring voluntariness." *Id.*

¶ 30     For these reasons, the court concluded that "a substantial-compliance standard is consistent with the general purpose of the [Act], and the specific purpose of the typeface requirements set forth in section 13-64-403." *Id.* at ¶ 37, 420 P.3d at 266.

¶ 31     After deciding to apply a substantial compliance standard, the court considered whether the arbitration agreement at issue substantially complied with the Act's typeface requirement. To

13

answer this question, the court applied the test for substantial compliance announced in *Bickel v. City of Boulder*, 885 P.2d 215 (Colo. 1994). *Bickel* teaches that, when deciding whether a party has substantially complied with constitutional or statutory requirements, a court should

> consider factors including, but not limited to, the following: (1) the extent of the [party's] noncompliance [with the requirements], (2) the purpose of the provision violated and whether that purpose is substantially achieved despite the [party's] noncompliance, and (3) whether it can reasonably be inferred that the [party] made a good faith effort to comply or whether the [party's] noncompliance is more properly viewed as the product of an intent to mislead.

*Id.* at 227.

¶ 32      In applying the first *Bickel* factor, the *Colorow* court held that the facility's noncompliance with the typeface requirement was "minimal." *Colorow*, ¶ 40, 420 P.3d at 267. The required language was present, separated from the rest of the text, in all capital letters, and in a larger font than required. *Id.* As to the second factor, the court held that "the purpose behind section 13-64-403 — voluntariness — is achieved despite the technical noncompliance." *Id.* at ¶ 41, 420 P.3d at 267. The arbitration

agreement at issue included the required disclosure language, and there was no evidence that the patient's representative had been coerced into signing the agreement. *Id.*

¶ 33 Finally, in considering the third factor, the court held that "it can reasonably be inferred that the Facility made a good faith effort to comply with the statute," as evidenced by the fact that the required text was set apart from the rest of the language of the arbitration agreement. *Id.* at ¶ 42, 420 P.3d at 267. The court "perceive[d] no effort to mislead, such as by burying the required text in fine print or by using a type of script that is unusually difficult to read." *Id.*

¶ 34 Thus, the court held that, despite the facility's technical noncompliance with the typeface requirement of the Act, it nonetheless substantially complied with the requirement, rendering the agreement enforceable. *Id.* at ¶ 43, 420 P.3d at 267.

C.  The District Court Did Not Err by Finding That the Agreement Was Unenforceable Under the Act

¶ 35 As explained below, the agreement here is unenforceable under the more lenient substantial compliance standard. For this reason, and because *Colorow* broadly held that providers need only

15

substantially comply with the Act, we do not discuss strict compliance in this case. If Rowan Community did not substantially comply with the Act by failing to give the Johnsons a fully signed and executed copy of the agreement, it could not have strictly complied with the relevant provisions of the Act.

### 1. Rowan Community's Failure to Provide the Johnsons with a Written Copy of the Agreement

¶ 36 The district court found that Rowan Community's representative did not provide the Johnsons with a written copy of the agreement after Mr. Johnson signed it during the process of admitting Christal to Rowan Community. According to the district court, the Johnsons did not receive a written copy of the agreement until they obtained one from Rowan's attorneys after initiating this litigation.

¶ 37 The district court applied the *Bickel* factors to find that Rowan Community did not substantially comply with the "written copy" requirement set forth in section 13-64-403(6).

¶ 38 In analyzing the first *Bickel* factor, the court held that Rowan Community's "noncompliance is not minimal; [it] violated a direct

16

provision of the statute by failing to provide [the Johnsons with] a copy of the Agreement 'signed by the parties.'" § 13-64-403(6).

¶ 39    The court determined that, under the second *Bickel* factor, Rowan Community's failure to provide the Johnsons with a written copy of the agreement "directly circumvent[ed]" a material purpose of the Act — to protect patients from "unknowingly and involuntarily waiving their rights to sue in court." *Colo. Permanente Med. Grp., P.C. v. Evans*, 926 P.2d 1218, 1232 (Colo. 1996). In addition, the court said that, "[w]ithout a copy of the written Agreement, [the Johnsons] were unable to fully exercise their 'right to seek legal counsel concerning this agreement' by not being able to show legal counsel the Agreement, and were unable [to] fully understand their right to rescind the Agreement." The Act's disclosure requirements and right to confer with counsel regarding an arbitration agreement are "important mechanisms" to protect patients from involuntarily giving up their right to bring their claims before a court and a jury.

¶ 40    Because Rowan Community did not give the Johnsons a written copy of the agreement, the court reasoned that they "were deprived of the opportunity to review the Agreement, a complex

17

document with statutory notices that can be problematic for lay people to understand in the best of circumstances, at their own pace and outside the stressful environment of an intake meeting for their sick daughter."

¶ 41 Regarding the third factor, while the court found "no evidence of an intent to mislead," or that Rowan Community acted in bad faith, it could not find that Rowan Community made a good faith effort to comply with the Act's requirement that the patient be provided with a written copy of the arbitration agreement "because it did not ensure that [the Johnsons] received a copy of the Agreement." Rather, "the Agreement was buried in a stack of papers" that Gleisner instructed the Johnsons to read and sign "in a relatively short period of time."

¶ 42 The district court correctly determined that Rowan Community did not substantially comply with the Act's "written copy" requirement. Rowan Community's noncompliance with this requirement was not minimal because it failed to provide the Johnsons with a written copy of the agreement until after the Johnsons filed suit. Provision of a signed arbitration agreement to the patient is integral to the Act's purpose of ensuring that the

patient enters into a health care arbitration agreement voluntarily. Unless she receives a written copy of the arbitration agreement she signed, in many circumstances, the patient would be unable to review that agreement's language in a stress-free setting, discuss it with an attorney, or contemplate the significance of waiving the right to a jury or court trial. As a result, she may not even be aware of her right to seek legal advice regarding the consequences of agreeing to arbitrate and her right to rescind the agreement if she decides, upon reflection, that she does not wish to consent to arbitration. Moreover, without a written copy of the arbitration agreement, the patient may not know how or when she can exercise the right to rescind.

¶ 43     In this case, the district court specifically found that the Johnsons "were deprived of the opportunity to review the Agreement" after admitting their daughter to Rowan Community and were not aware of its terms. Even if Rowan Community did not act in bad faith by failing to provide the Johnsons with a written copy of the agreement, the Johnsons lacked a meaningful opportunity to consider the significance of waiving their right to a jury or court trial and, if they decided upon reflection they did not

wish to consent to arbitration, to exercise their right to rescind the agreement. Thus, even if Rowan Community acted in good faith, that good faith alone would not make up for its noncompliance with the "written copy" requirement of section 13-64-403(6).

¶ 44   Rowan notes that, in *Colorow*, the supreme court held that the health care provider substantially complied with the Act, even though it had indisputably violated the provision of the Act mandating that the required disclosure statement appear in bold-faced type. But there is a material distinction between a provider's use of an incorrect typeface in an arbitration agreement and its failure to provide the patient with a written copy of the agreement. Unlike the former noncompliance with the Act's requirements, the latter noncompliance is more likely to be material to the issue of voluntariness and may have a direct bearing on the patient's ability to understand the significance of waiving the right to a jury or court trial, to consider whether waiving such right is in her best interest, and, if she decides upon reflection not to arbitrate, to exercise her right of rescission. The failure to give a patient a written copy of an arbitration agreement will often be a

"more significant deficienc[y]" than the "minor typographical" error in *Colorow*. *Colorow*, ¶ 35, 420 P.3d at 266.

¶ 45     As *Colorow* made clear, while "strict consistency isn't the objective[,] [v]oluntariness is." *Id.* at ¶ 36, 420 P.3d at 266. Here, the voluntariness of the Johnsons' agreement to waive their right to a jury or court trial was not safeguarded because they lacked a written copy of the document they needed — in any typeface — to make a substantive decision about arbitration and exercising their statutory right to rescind.

¶ 46     Moreover, the absence of a meaningful alternative to the provision of a written copy of the arbitration agreement to the patient distinguishes the Johnsons' case from *Colorow*. Rowan does not offer any alternative to providing the patient with a written copy of an arbitration agreement, as section 13-64-403(6) requires. Instead, Rowan suggests that, following Christal's admission, the Johnsons could have called Rowan Community to request a written copy of the agreement.

¶ 47     The supreme court's decision in *Colorow* rested on its conclusion that there was a meaningful alternative to the Act's typeface requirement that furthered that subsection's purpose of

21

providing notice. *See Colorow*, ¶ 29, 420 P.3d 264-65. The court determined that the purpose of the Act's bold-faced type requirement — to "emphasize the required language" and "encourage[] patients to read it and understand its importance" — could be accomplished by other means, such as "[h]ighlighting the text in a particular color, underlining it, [or] printing it in all capital letters . . . ." *Id.* at ¶¶ 28-29, 420 P.3d at 264-65.

¶ 48     In contrast, Rowan's suggestion that the Johnsons could have called Rowan Community following Christal's admission to request a written copy of the agreement assumes that the Johnsons recognized the significance of the papers they signed during their meeting with Gleisner. This is contrary to the Act's presumption that a patient does not fully appreciate the consequences of signing an arbitration agreement while in the stressful process of admission to a health care facility. Moreover, the Act specifies that the health care provider, and not the patient, bears the burden of complying with the Act. *See* § 13-64-403(12)(a)(I).

¶ 49     In the absence of a meaningful alternative to the requirement that the health care provider give the patient a written copy of the

22

arbitration agreement she signed, Rowan Community could not have substantially complied with the Act when it failed to provide the Johnson with a written copy of the agreement until after the suit was filed.

¶ 50     Therefore, we conclude that the agreement is unenforceable because Rowan Community did not substantially comply with the "written copy" requirement set forth in section 13-64-403(6).

2.     Rowan Community's Failure to Sign the Agreement

¶ 51     Rowan does not dispute that no representative of Rowan Community signed the agreement.  Rowan initially contends, however, that the absence of Rowan Community's signature does not preclude the formation of a contract under common law principles.  The formation of a contract between the Johnsons and Rowan Community under common law principles is not determinative, however, because the Act imposes more stringent requirements for contract formation than does the common law of contracts.  Thus, we confine our analysis to the Act's signature requirement.

¶ 52     We agree with the district court's conclusion that, under the *Bickel* factors, Rowan Community failed to substantially comply

with the Act's signature requirement, in addition to the Act's "written copy" requirement.

¶ 53    Under the first *Bickel* factor, the court found that Rowan Community's noncompliance with the signature requirement was not minimal because Rowan Community directly violated a provision of the Act by "fail[ing] to sign and execute the Agreement as required by two sections of the [Act]."

¶ 54    The court further found that, under the second *Bickel* factor, Rowan Community's failure to sign the agreement did not satisfy the Act's purpose.  The court explained that the ninety-day statutory rescission period, "which is an important safeguard to ensure that the statute's purpose of voluntariness is effectuated," does not begin to run until both parties have signed the arbitration agreement.

¶ 55    The language of the Act is unambiguous — the date of the "signature by both parties" marks the date on which the ninety-day rescission period begins to run.  § 13-64-403(3)-(4) (emphasis omitted).  Without the health care provider's signature, the rescission period never commences.  Thus, the purpose of the Act that the patient have a meaningful opportunity to rescind an

24

arbitration agreement is not satisfied if the health care provider does not comply with the signature requirement.

¶ 56 Finally, although the court found no evidence that Rowan Community intended to mislead the Johnsons or acted in bad faith by failing to sign the agreement, it could not find that Rowan Community made a good faith effort to comply with the signature requirement.

¶ 57 We adopt the district court's thoughtful application of the *Bickel* factors to the signature requirement.

¶ 58 On appeal, Rowan challenges the district court's holding that the Act requires both the provider and the patient to sign health care arbitration agreements by contending that the "subsections' reference to 'both parties' defines a point in time, rather than a requirement . . . ."

¶ 59 While we acknowledge that sections 13-64-403(3) and 13-64-403(4) do not include mandatory language such as "shall," Rowan's argument is unpersuasive. If the signatures of "both parties" were not a requirement for enforcement of a health care arbitration agreement, the language of the Act requiring that the

patient receive a written copy of the agreement and granting the patient a rescission period would make no sense.

¶ 60     Section 13-64-403(6) provides that "[t]he patient shall be provided with a written copy of [the] agreement . . . at the time that it is signed by the parties." § 13-64-403(6).  In addition, section 13-64-403(3) states, in relevant part, that the rescission period expires "ninety days after the agreement has been signed and executed by *both* parties." § 13-64-403(3) (emphasis added).  Thus, the date on which the rescission period began to run and the date on which it expired are inextricably linked to the date on which the arbitration agreement was "signed and executed by both parties," which, in this case, never happened.  *Id.*  For this reason, like the written copy requirement, the signature requirement was material to the issue of voluntariness.

¶ 61     As noted above, under the Act, an arbitration agreement between a health care provider and a patient can be voluntary only if the patient has the right to reflect on the implications of signing such an agreement and the right to rescind it if the patient changes her mind about arbitration.  *See* § 13-64-403(1).  Any uncertainty as to the date on which the rescission period begins to run

26

increases the likelihood that the patient will miss the rescission deadline. And in this case, the failure of the facility to sign unfairly placed the burden of determining when the rescission period began to run, and when it expired, on the Johnsons.

¶ 62 Finally, Rowan contends that the missing signature is inconsequential because Rowan Community did not "coerce or induce Mr. Johnson's voluntary signature to the Agreement." Rowan is correct that the district court did not find that Rowan Community took actions to coerce Mr. Johnson into signing the agreement. But the Act does not state that health care arbitration agreements are enforceable in the absence of evidence of coercion, even if they do not comply with the Act's requirements. Rather, it assumes that some degree of coercion is inherent in the patient's execution of these types of agreements — which is why the Act grants the patient a ninety-day rescission period to think over the decision to consent to arbitrate and to confer with counsel about the merits of arbitration.

¶ 63 This rescission period was necessary here to ensure the voluntariness of the Johnsons' execution of the agreement, given the risk of coercion when a patient makes difficult health care

27

decisions and the patient's "lack of information" at the time of signing an arbitration agreement. *Colo. Permanente*, 926 P.2d at 1227 n.17.

¶ 64 Because Rowan Community did not substantially comply with sections 13-64-403(3) and 13-64-403(4), the agreement is unenforceable.

### III. Conclusion

¶ 65 The order is affirmed.

JUDGE PAWAR and JUSTICE MARTINEZ concur.